362 F.Supp. 522 (1973)
FEDERAL POWER COMMISSION, an independent regulatory agency of the United States, Plaintiff,
v.
The CORPORATION COMMISSION OF the STATE OF OKLAHOMA et al., Defendants.
Colorado Interstate Gas Company, et al., Intervening Plaintiffs;
The GHK Company, a general partnership et al., Intervening Defendants.
No. Civ. 72-832.
United States District Court, W. D. Oklahoma.
June 26, 1973.
*523 *524 *525 William R. Burkett, U. S. Atty., W. D. Okl.; Leo E. Forquer and John H. Burnes, Federal Power Commission, Washington, D. C., George W. McHenry, Jr., Acting Solicitor, Federal Power Comm, for plaintiff.
Elmer J. Jackson, Hastings, Neb., Lee B. Thompson, Oklahoma City, Okl., Peter Kauffman, Chicago, Ill., John D. Townsend, Houston, Tex., Edwyn R. Sherwood, Colorado Springs, Colo., Joseph M. Wells and Paul E. Goldstein, Chicago, Ill., Hal D. Leaming, Oklahoma City, Okl., Raymond N. Shibley, Washington, D. C., Barth P. Walker, Oklahoma City, Okl., for intervening plaintiffs.
Harvey H. Cody, Jr., Conservation Atty., Oklahoma Corp. Commn, Oklahoma City, Okl., for defendants.
Eugene O. Kuntz, Richard W. Fowler, Judson S. Woodruff, John M. Mee and Stanley L. Cunningham, Oklahoma City, Okl., for intervening defendants.

MEMORANDUM OPINION
HILL, Circuit Judge, DAUGHERTY, Chief Judge, and EUBANKS, District Judge.
EUBANKS, District Judge.
In this proceeding the Federal Power Commission and Intervening Plaintiffs seek to enjoin the enforcement of Order No. 93,381 and Order No. 93,382 of the Defendant Oklahoma Corporation Commission, entered on October 5, 1972, effective October 1, 1972, but stayed by said Defendant until July 1, 1973.
The Findings in Order No. 93,381 recite that "present Oklahoma gas reserves total approximately 17 trillion cubic feet"; that the current annual production approximates ten percent of those reserves; that the rate of production of gas is increasing while additions to reserves are diminishing; that "the wellhead price for approximately 98 percent of all Oklahoma gas varies from .03 cents per MCF to .32 cents per MCF"; and that the "wellhead price does not respond readily to market supply and demand factors due to a combination of long term gas contracts and Federal price regulations." The Order further recites that "the Federal Power Commission has refused to recognize that a field price may be too low;" (italics ours) that low wellhead prices "cause gas wells to be shut down before all reasonable gas has been produced, a clear example of physical waste" which is certain to increase as operating costs continue to rise where wellhead prices remain constant under long term purchase contracts; that "an unreasonably low sale price for gas encourages, and perhaps requires, the lease operator to produce gas at progressively higher rates [increased volume] to offset rising operating *526 costs, thus risking damage [injury] to a rate sensitive reservoir, and consequent waste of recoverable reserves"; that "wells are being plugged and abandoned in Oklahoma while they are still capable of producing substantial remaining volumes of gas, rendering those reserves unrecoverable"; that the Corporation Commission has authority to promulgate and enforce rules and orders for the prevention of waste; and that "the shutting in of gas wells to prevent waste does not conflict with the exclusive authority of the Federal Power Commission under the Natural Gas Act." The Commission found and the Order recites "that the production of natural gas which hereafter is to be sold at a price so low as to cause waste is contrary to law and should be prohibited" and that "a wasteful price is any price below .20 cents per MCF for gas being produced and sold" on October 1, 1972.
On the basis of the foregoing "Findings", Order 93,381, provided, among other things, that:
The production within the State of Oklahoma of natural gas from any gas well or casinghead gas from any oil well, which thereafter is to be sold at a price so low as to cause physical waste is prohibited.
Until such time as the Commission shall determine otherwise with respect to a particular well or wells, after notice and hearing, a price of below .20 per MCF shall be deemed wasteful.
Order No. 93,382 was issued pursuant to the request of Intervenor Glover, Heffner, Kennedy Oil Company which asked the Commission in fashioning its Order to include a factor for the depth of the well. The Commission found that the range of wellhead gas prices stifles the search for new gas reserves, especially in the deep and up to now relatively unexplored areas and that gas which is never found and produced because of the cost and the risk being too great is totally wasted.
The Commission found, in Order 93,382, that a depth price factor in fixing prices is essential to prevent the waste caused by non-exploration and non-development, and "that a wasteful price is any price below that stated in the following scale," based on depth at which the gas is produced:

Below 15,000 feet and above 20,000 feet .25 per MCF
Below 20,000 feet and above 25,000 feet .35 per MCF
Below 25,000 feet .50 per MCF

The Order No. 93,382 delineated a "Depth Factor" and fixed prices in accordance with the Findings.
The statutes of Oklahoma, pursuant to which the Defendant entered the Orders in question, expressly provide in pertinent part:
The term "waste", as applied to gas, in addition to its ordinary meaning, shall include . . . the inefficient or wasteful utilization of gas from gas wells drilled to and producing from a common source of supply; the production of gas in such quantities or in such manner as unreasonably to reduce reservoir pressure or unreasonably to diminish the quantity of oil or gas that might be recovered from a common source of supply; . . . waste incident to the production of natural-gas in excess of transportation and marketing facilities or reasonable market demand; . . . and the unnecessary depletion or inefficient utilization of gas energy contained in a common source of supply. In order to prevent the waste or to reduce the dissipation of gas energy contained in a common source of supply, in addition to its other powers in respect thereof, the Commission shall have the authority to limit the production of gas from wells producing gas only to a percentage of the capacity of such wells to produce. The production of gas in the State of Oklahoma in such manner and under such conditions as to constitute waste as in this Act defined is hereby prohibited, and the Commission shall have authority and is charged with the duty to make rules, regulations, and orders for the prevention of such waste".
*527 The Federal Power Commission brought this action on December 1, 1972, alleging that the Orders of the Oklahoma Corporation Commission conflict with the jurisdiction of the Federal Power Commission under the Natural Gas Act, 15 U.S.C. §§ 717-717w, and that the said Orders also constitute an invalid burden on interstate commerce in violation of the commerce clause of the federal Constitution. The Complaint prayed for the convening of a three-judge court and said court was constituted on December 12, 1972.
Shortly thereafter and on December 26, 1972, Colorado Interstate Gas Company, a division of Colorado Interstate Corporation, a corporation, Kansas-Nebraska Natural Gas Company, Inc., a corporation, Natural Gas Pipeline Company of America, a corporation, Northern Natural Gas Company, a corporation, and Panhandle Eastern Pipe Line Company, a corporation, were allowed to enter the case as Intervening Plaintiffs. On February 6, 1973, THE GHK COMPANY, a general partnership, of which the partners are Robert A. Heffner III, David O'D. Kennedy and GHK CORPORATION, GASANADARKO, LTD., a limited partnership, of which the general partners are Robert A. Heffner III and David O'D. Kennedy, INEXCO OIL COMPANY, a corporation, and AMAREX, INC., a corporation, were permitted to come into the cause as Intervening Defendants.
A final pre-trial conference was held on May 14, 1973, at which all of the parties agreed that no additional evidence would be offered other than that submitted by stipulation. At this conference it was also stipulated by counsel and ordered by the judge to whom the case was originally assigned that the issues now before the Court for resolution are as follows:
1. Whether the orders of the Oklahoma Corporation Commission constitute an undue burden on interstate commerce within the purview of the commerce clause of the Federal Constitution?
2. Do the Orders of the Oklahoma Corporation Commission conflict with the jurisdiction of the Federal Power Commission under the Natural Gas Act?
3. Does the Complaint present a justiciable controversy or cause of action?
4. Does the Federal Power Commission have standing to initiate or pursue this action against the Defendants?
5. Should this Court abstain pending a determination by the Oklahoma Supreme Court of the appeals now pending therein under consolidated cases Nos. 46114, et al.?
We consider those issues in the order listed.
The Oklahoma Corporation Commission argues that the Orders complained of do not constitute an undue burden on interstate commerce; that the expressed intention of the Orders is to prevent the waste of natural gas by insuring that the maximum reasonable volume of gas will be produced from each well and reservoir; and that, if the Orders accomplish their intended purpose, more gas will be available for consumption to all consumers, including interstate consumers. The argument is that the Orders in question burden interstate commerce no more than other orders of Defendant, to-wit: "A well may be shut in to prevent pollution; it may be shut in because it is in an over-produced status; it may be shut in because the operator has not complied with the statute (52 O.S.1971 § 318.1) or rule (O.C.C.-O.G.R. 3-201) requiring proof of financial responsibility," each of which affects interstate commerce if the shut in well is committed to an interstate market, and supportive of this argument the Oklahoma Corporation Commission calls our attention to Cities Service Gas Co. v. Peerless Oil and Gas Company, 1950, 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190; Head v. New Mexico Board of Examiners in Optometry, 1963, 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983; Huron Portland *528 Cement Co. v. City of Detroit, 1960, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852. And said Defendants argue that "the prices mentioned in the challenged Orders are not minimum prices." Said Orders, it is asserted, serve only to categorize wells. "If a well is producing gas under [a contract below .20 cents per MCF] the operator must demonstrate to the Commission that continued production at the contract price will not result in either of the two forms of waste to which the rules are directed . . . the rules do not establish a minimum price nor do they attempt to establish a uniform price or to regulate price. They require only reasonable assurance that the price realized for the gas, whatever it may be, will not cause waste."
Against a challenge of validity the Orders cannot stand upon the legislature declaration of the Oklahoma Corporation Commission alone. In Foster-Fountain Packing Co., et al. v. Haydel, 1928, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147, the Court held that the refusal of a three-judge court to enjoin enforcement of a Louisiana statute, which forbade the exportation of shrimp from which heads or shells had not been removed, was an improvident exercise of judicial discretion and reversed. The Court said:
The facts alleged in the complaint, the details set forth in plaintiffs' affidavits and the provisions of the act to be restrained show that the conservation of hulls and heads in a feigned and not the real purpose.

. . . . . .

One challenging the validity of a state enactment on the ground that it is repugnant to the commerce clause is not necessarily bound by the legislative declarations of purpose. It is open to him to show that in their practical operation its provisions directly burden or destroy interstate commerce. [Citations omitted] In determining what is interstate commerce, courts look to practical considerations and the established course of business. [Citations omitted] Interstate commerce includes more than transportation; it embraces all the component parts of commercial intercourse among states. And a state statute that operates directly to burden any of its essential elements is invalid. p. 10, 49 S.Ct. p. 3. [Emphasis ours]
When a State regulates the sending of natural gas across State lines, said Mr. Justice Frankfurter in Toomer v. Witsell, 1948, 334 U.S. 385 at 409, 68 S.Ct. 1156, at 1168, 92 L.Ed. 1460, "we have commerce among the States as to which State intervention is subordinate to the Commerce Clause. That is the nub of the decision in Foster-Fountain Packing Co. v. Haydel." The record in this case abounds with evidence supporting the Plaintiff's allegation that the chief purpose of the Orders in question is to establish statewide minimum prices of natural gas at the wellhead. The proceedings which gave rise to the challenged Orders were instituted by the Director of Conservation of the subject Defendant. The Application, the Notices of the Hearing, and all subsequent orders in the proceeding declare the purpose to be to fix minimum wellhead prices. All are entitled:
Application of Don R. Dunnett, Director of Conservation, for the Corporation Commission of the State of Oklahoma to enter an order establishing a statewide minimum price or prices for natural gas and casinghead gas at the wellhead and prohibiting the sale of gas below the price or prices so established. [Emphasis ours]
In its Report and Order of February 1, 1972, the Defendant Oklahoma Corporation Commission found:
That this is an application of the Director of Conservation for a general order of the Commission establishing minimum wellhead prices for natural gas and casinghead gas produced within the State of Oklahoma, and prohibiting the sale of gas below the minimums so fixed.
At a pre-trial conference held in connection with the Oklahoma Corporation Commission hearings regarding the *529 questioned Orders, on January 18, 1972, counsel for an Intervenor Defendant therein made inquiry about the substantive issues of the proceeding. The response was as follows:
MR. CUNNINGHAM: If Your Honor please, would it be appropriate at this time to address ourselves to the substantive issues of this proceeding?
CHAIRMAN NESBITT: We're getting just very close to it. Thank you, sir, and you will get an opportunity. Mr. Cody [Conservation Attorney of Defendant], would you tell us briefly the scope of the Application as you conceive it and the evidence that the Department will have in general terms in support of the Application? This might get us properly into the substantive issues.
MR. CODY: The application merely asks that the Commission set the hearing or hearings to determine, first, whether or not there should be a minimum price or prices for natural and casinghead gas within the State of Oklahoma . . . We allege in the Application and expect to prove by evidence from the Oklahoma Tax Commission, the evidence of prices that are paid for gas within Oklahoma; the prices that are paid for gas outside Oklahoma; the prices that gas is bringing in areas over the country; to show that there is wide disparity between the fair market value of gas and prices that is actually being paid at the wellhead.
In addition to that, the price is so low in many instances in the State as to actually encourage physical waste so that many wells in Oklahoma are venting copious quantities of gas in oil wells having copious quantities of gas; that many consumers of gas are not consuming it in an economic fashion because the gas is so cheap, so that, in effect, it hurts other fuel industries in that natural gas is far superior from any other fuels for most purposes, rendering it uneconomic because of the cheapness and of the disparity between the price gas is bringing and the price other fuels are bringing. It is not even economic to develop coal deposits, oil shale deposits and other sources of energy.
I think our evidence will be price evidence.
Thereafter, according to the record of the Administrative hearing, a colloquy ensued between the Chairman and Mr. Cody, the Conservation Attorney, on whether, in fashioning an order to carry out the intended purpose announced by Mr. Cody, a distinction would be made between the interstate and intrastate sales with the purchasers, following which counsel for then and now Intervenor GHK Company recognized that "there are serious, probably insurmountable, constitutional problems insofar as the Commission would attempt to regulate interstate prices and, therefore, we would urge that the hearing and certainly the Commission's order be limited to intrastate prices." And, "We would support limiting this to intrastate gas, recognizing that the Supreme Court has held the [interstate] field in preempted." GHK counsel remained firm in his position throughout the proceedings and in closing arguments reemphasized that the Defendant's "power to regulate the sale of gas by producers is limited to those sales in intrastate commerce."
Throughout the hearings concern was expressed that the Federal Power Commission's then price regulation was inadequate to encourage exploration and development. Counsel for Western Oklahoma Royalty Owners Association expressed his client's position as follows:
In some way, there must be brought to an end the present harsh economic controls imposed by the Federal Power Commission. We feel that a fair minimum price should be fixed for the sale of deep gas produced in Oklahoma . . .
Witness John M. Campbell, President of John M. Campbell Company and International Petroleum Institute, Limited, *530 and a consulting petroleum engineer, characterized the Federal Power Commission's pricing policies, as "idiotic" and "uninformed". Witness Richard Wheeler, an engineer for Defendant Intervenor Glover Heffner Kennedy Oil Company, testified, in part, as follows:
I think the only thing that is going to increase gas reserves and increase production in the State of Oklahoma is higher prices. And I prefer, I mean, I prefer state regulations to federal regulations, myself, and we have been regulated from the federal in this area and I prefer state regulation myself.
At the conclusion of hearings, Defendant Oklahoma Corporation Commission promulgated Orders 93,381 and 93,382. The former, in pertinent part, recites that:
The present intrinsic value of Oklahoma gas is more than .60 cents per MCF at the wellhead.
The wellhead price for approximately 98 percent of all Oklahoma gas varies from .03 cents per MCF to .32 cents per MCF, and the average is .15 cents to .17 cents. Wellhead price does not respond readily to market supply and demand factors due to a combination of long term gas contracts and Federal price regulation.
. . . the Federal Power Commission entered the picture, and undertook to regulate the price of gas sold in interstate commerce. It has . . . refused to recognize that a field price may be too low. Thus, if a producer has a bad contract, he must live with it; but if he drives a good bargain, he may see the price cut back. Such a philosophy of regulation stifles development, and eventually harms the very consumers it purports to protect, as events have proven . . .
This Court finds that the subject orders, do in fact, establish a minimum price at which gas may be sold in interstate commerce. With this fact in mind we continue to focus upon the first question.
Do the Orders in question "regulate" interstate commerce or place an undue burden thereon in violation of the federal commerce clause? The Defendant argues that the question must be answered in the negative  that a State may, in general, exercise its legitimate police power despite an incidental effect on a preemptive Federal program, so long as the State does not impose a burden which materially affects the Federal program in an area where uniformity of regulation is necessary. "This, in our view, is the crux of the matter," says the Defendant.
Exercises of the State police power and the limitations thereon imposed by the federal commerce clause have necessitated a long, continuous process of judicial adjustment. In Freeman, Trustee v. Hewit, Director, 1946, 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265, speaking for the Court, Mr. Justice Frankfurter said:
The need for such adjustment is inherent in a federal government like ours, where the same transaction has aspects that may concern the interests and involve the authority of both the central government and the constituent States.
The history of this problem is spread over hundreds of volumes of our Reports. To attempt to harmonize all that has been said in the past would neither clarify what has gone before nor guide the future. Suffice it to say that especially in this field opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts. pp. 251-252, 67 S.Ct. p. 276.
The federal commerce clause, continued Mr. Justice Frankfurter, was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an *531 area of trade free from interference by the States. Continuing, he said:
This limitation on State power ... does not merely forbid a State to single out interstate commerce from hostile action. A State is also precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States. It is immaterial that local commerce is subjected to a similar encumbrance. It may commend itself to a State to encourage a pastoral instead of an industrial society. That is its concern and its privilege. But to compare a State's treatment of its local trade with the exertion of its authority against commerce in the national domain is to compare incomparables.
These principles of limitation on State power apply to all State policy no matter what State interest gives rise to its legislation. p. 252, 67 S.Ct. p. 276.
The factual situation at bar and the questions at issue are similar to those involved in Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L. Ed. 1117, where, in original actions brought in the Supreme Court of the United States by Pennsylvania and Ohio, enforcement was enjoined of an act of the legislature of West Virginia, intended, through regulation of pipeline companies, to compel the retention within West Virginia of all natural gas produced there, that might be required for local needs. The case was given much judicial attention. It was first argued in 1921, was restored to the docket and reargued in 1922, and was returned to the docket a second time and reargued in 1923, following which the decision issued.
In the light of the initial argument and the two rearguments and the attention which the case received at the hands of the Court, the case is not an isolated decision to be looked at askance; rather it is the symbol of one of the weightiest doctrines in our law. It expressed the momentum of legal history which preceded it. Around it has clustered a voluminous body of rulings. In the course of the opinion, the Court said:
... the question is whether the enforced withdrawal for the benefit of local consumers is such an interference with interstate commerce as is forbidden to a State by the Constitution. The question is an important one; for what one State may do others may, and there are 10 states from which natural gas is exported for consumption in other States. Besides, what may be done with one natural product may be done with others, and there are several states in which the earth yields products of great value which are carried into other States and there used . . .
By the Constitution, Art. I, § 8, cl. 3, the power to regulate interstate commerce is expressly committed to Congress and therefore impliedly forbidden to the states. The purpose in this is to protect commercial intercourse from invidious restraints, to prevent interference through conflicting or hostile state laws and to insure uniformity in regulation. It means that in the matter of interstate commerce we are a single nation  one and the same people . . .
Natural gas is a lawful article of commerce and its transmission from one state to another for sale and consumption in the latter is interstate commerce. A state law, whether of the State where the gas is produced or that where it is to be sold, which by its necessary operation prevents, obstructs or burdens such transmission is a regulation of interstate commerce  a prohibited interference. [Citing cases] pp. 595-597, 43 S.Ct. pp. 664 665. [Emphasis ours]
There, as here, it was argued that the supply of natural gas was waning and that the act was therefore a valid measure in the interest of the people of the State. In reply the Court observed that the same argument had been rejected in the earlier holding in Oklahoma v. Kansas Natural Gas Co., 1911, 221 U.S. 229, *532 31 S.Ct. 564, 55 L.Ed. 716, involving the validity of an Oklahoma statute designed to accomplish the retention of natural gas within the State, in which the Court had said:
The results of the contention repel its acceptance. Gas, when reduced to possession, is a commodity; [which] . . . [is] subject to sale, and may be a subject of intrastate commerce and interstate commerce. The statute of Oklahoma recognizes it to be a subject of intrastate commerce, but seeks to prohibit it from being the subject of interstate commerce, and this is the purpose of its conservation. In other words, the purpose of its conservation is in a sense commercial  the business welfare of the state, as coal might be, or timber. Both of those products may be limited in amount, and the same consideration of the public welfare which would confine gas to the use of the inhabitants of a state would confine them to the inhabitants of the state. If the States have such power a singular situation might result. Pennsylvania might keep its coal, the Northwest its timber, the mining states their minerals. And why may not the products of the field be brought within the principle? Thus enlarged, and without that enlargement, its influence on interstate commerce need not be pointed out. To what consequences does such power tend? If one State has it, all States have it; embargo may be retaliated by embargo, and commerce will be halted at state lines. And yet we have said that `in matters of foreign and interstate commerce there are no state lines.' ... This was the purpose, as it is the result, of the interstate commerce clause of the Constitution of the United States. If there is to be a turning backward it must be done by the authority of another instrumentality than a court. pp. 255-256, 31 S.Ct. p. 571.
In Hood & Sons, Inc. v. DuMond, Commissioner, 1949, 336 U.S. 525, 69 S. Ct. 657, 93 L.Ed. 865, a distributor of milk in Massachusetts who operated gathering and receiving plants in New York, applied to the New York authorities for a license for an additional plant and the application was denied on the grounds that the proposed expansion of the applicant's facilities would reduce the supply of milk for local markets and would result in destructive competition in a market already adequately served. In holding that the statute violated the interstate commerce clause, Mr. Justice Jackson, who spoke for the Court, traced the history of the commerce clause and observed that "our economic unit is the nation, which alone has the gamut of powers necessary to control the economy." Therein it was said:
The material success that has come to the inhabitants of the states which make up this federal free trade unit has been the most impressive in the history of commerce, but the established interdependence of the states only emphasizes the necessity of protecting interstate movement of goods against local burdens and repressions. We need only consider the consequences if each of the few states that produce copper, lead, high-grade iron ore, timber, cotton, oil or gas should decree that industries located in that state shall have priority . . .
Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders', such has been the doctrine of this Court which has given it reality. pp. 538-539, 69 S.Ct. p. 665.
The primary meaning of the word "regulate" is to lay down the rule by which a thing shall be done. "The *533 power to regulate commerce is the power to prescribe the rule by which commerce shall be governed . . ." United States v. E. C. Knight Co., 1895, 156 U. S. 1, 12, 15 S.Ct. 249, 253, 39 L.Ed. 325. "No distinction is more popular to the common mind, or more clearly expressed in the economic and political literature, than that between manufactures [production] and commerce. Manufacture is transformation  the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce . . ." Kidd v. Pearson, 1888, 128 U.S. 1, at 20, 9 S.Ct. 6, at 10, 32 L.Ed. 346. The Orders of Defendant in the instant case lay down a rule by which natural gas produced in Oklahoma may move from Oklahoma to other states. The Orders constitute, therefore, a regulation and are violative of the federal interstate commerce clause.
The Orders in question place a further burden on interstate commerce in that they jeopardize the interstate supply of natural gas. Approximately 95% of the proven reserve inventory of the lower forty-eight states "is already committed to gas sales contracts," Federal Power Commission v. Louisiana Power & Light Co., 1972, 406 U.S. 621, 626, footnote 2, 92 S.Ct. 1827, 1831, 32 L.Ed.2d 369. Oklahoma is the third largest gas producing State in the nation. It supplies approximately nine percent of the total domestic gas sold in interstate commerce.
The Record confirms the dependency of the interstate market on natural gas produced in Oklahoma. The manager of gas production for Intervenor Colorado Interstate Gas Company, testified that his company purchases about 120 million feet of natural gas per day in Oklahoma which is transported via interstate pipeline to consumers in Colorado and Wyoming and that 95% of its gas purchases in Oklahoma move in interstate commerce. The Manager of Certificates for Intervenor Panhandle Eastern Pipe Line Company testified that Panhandle Eastern produces approximately 15 to 16 billion cubic feet of gas annually in Oklahoma, which constitutes about 35 percent of Panhandle's total gas supply, and that in excess of 95% of the total gas produced and purchased by his employer in Oklahoma moves in interstate commerce.
We think the orders in question would burden interstate commerce by indirectly fixing prices to interstate consumers. The Complaint alleges [tentative estimates, based on 1972 data on file with the Plaintiff], that, when passed through pipeline and distributor rates, the Orders being challenged will have an impact in excess of $30,000,000.00 per year upon the interstate consuming public. A witness at the Administrative hearing, for Intervenor Panhandle Eastern Pipe Line Company, testified that if the .20 cent minimum price had been in effect in 1971, the increase in the cost of gas to said Intervenor would have been $3,927,000.00.
The Orders burden interstate commerce in that they conflict with rates fixed by the Plaintiff under the Natural Gas Act. At the Administrative hearing, the manager of production for Intervenor Colorado Interstate Gas Company testified that all of said Intervenor's contracts had been submitted to and approved by the Plaintiff. He testified that:
We are a federally regulated company subject under the Natural Gas Act and as such, our prices that we can charge for gas and the price that is allowed for our produced gas is subject to their regulation, and this proposal will adversely affect Colorado Interstate in that respect . . . It will set a price that is not compatible with the price that FPC has allowed.
The Manager of Certificates of Intervenor Panhandle Eastern Pipe Line Company recommended that any minimum price order which the Commission might enter, at the conclusion of the *534 proceedings, "Not include an interstate pipeline company", following which he testified as follows:
Q In your opinion, is the continuing orderly business operation of Panhandle Eastern Pipeline Company dependent upon not being, shall we say, subjected to the conflicting jurisdiction between two regulatory commissions?
A Yes, sir.
Q In your opinion, would there be such a conflict in the event the order would be directed toward Panhandle Eastern?
A Yes, sir.
Phillips Petroleum Company is a major producer in Oklahoma. The manager of gas sales contract administration of Phillips testified at the Administrative hearing that Phillips sells its gas to interstate purchasers pursuant to contracts on file and rate schedules approved by the Federal Power Commission and that conflicts will result if the subject Orders should become effective. He testified on direct examination as follows:
Q Mr. Cullender, I assume that insofar as a minimum price order issued by this Commission wherein the producer would be required to receive not less than .20 cents per MCF at the wellhead, as each of the three contracts in question shows on Exhibit 31 are concerned, the orders would be inconsistent, would they not, the Corporation Commission's orders and the governing terms of FPC certification and orders?
A Well, I don't know if they would be inconsistent, they would be in conflict.
Q All right, I mean the word conflict.
A If we were shut in, I presume that it is the alternative we have, because we are not permitted either by contract or FPC regulation either one to collect .20 cents per MCF for the gas . . .
Q In the event we elected to honor each order, not being desirous of violating a regulatory order, be it state or federal rules, what effect would such action have upon the supply of natural gas presently going into interstate markets?
A It would decrease it . . .
Q If I am right, that is approximately 36½ billion cubic feet a year that would cease to move into interstate market from our two systems alone, is that correct?
A Yes.
The witness further testified on direct examination that if Intervenor Phillips should accept .20 cents per MCF for some gas it sells in interstate commerce, it would be in violation of outstanding certificates from the Federal Power Commission and that the violation would expose Phillips to penalties under the Natural Gas Act. He testified that:
Q Insofar as the problem that we would be faced with, we would find ourselves being subjected to fines, our executive officers being exposed to criminal liabilities, or being exposed to civil liabilities. This is the dilemna we find ourselves in if the minimum price order were to cover interstate gas. Is this correct, Mr. Cullender?
A Yes. In this type of operation, unless we were exempted from the order this is the thing we would be faced with.
The Supreme Court of the United States recently considered the inability of a producing state to interfere with the interstate supply of natural gas. In Federal Power Commission v. Louisiana Light & Power Co., supra, a pipeline company was experiencing temporary shortages of its natural gas supply, forcing it to reduce deliveries to its contract customers. Therein the Federal Power Commission asserted jurisdiction to effect a reasonable curtailment plan covering deliveries to both direct sales customers and purchasers for resale. The Louisiana utility resisted the authority *535 of the FPC to regulate the curtailments. In upholding the authority of the FPC the Court said:
Insofar as state plans purport to curtail deliveries of interstate gas, Pennsylvania v. West Virginia (1923), 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117, is authority that such plans, when they operate to withdraw a large volume of gas from an established interstate current whereby it is supplied to customers in other States, would constitute a prohibited interference with interstate commerce.
The subject Orders, to the extent that they threaten "to withdraw a large volume of gas from an established interstate current" constitute an undue burden on interstate commerce in natural gas and are violative of the federal commerce clause.
In arguing that the contested Orders do not violate the commerce clause Defendants rely on Cities Service Co. v. Peerless Oil & Gas Co., et al., 1950, 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190 and Phillips Petroleum Co. v. Oklahoma, et al., 1950, 340 U.S. 190, 71 S.Ct. 221, 95 L.Ed. 204 and their progeny. In Peerless, supra, the issue was the power of a state to fix prices at the wellhead on natural gas produced within its borders and sold interstate. The Oklahoma Corporation Commission had issued an order setting a minimum wellhead price of all gas taken from the Guymon-Hugoton Field, located in Texas County, Oklahoma, and a second order which directed a producer in this field and operator of an interstate gas pipelining system [Cities Service] to take gas ratably from another producer [Peerless] in the same field having no pipeline outlet of its own, at the price fixed by the Oklahoma Corporation Commission. Cities Service Co. challenged the orders as violative of the federal commerce clause. In affirming the Supreme Court of Oklahoma which upheld the validity of the Orders, the Court pointedly noted that federal authority had not then been exercised in the area of regulating wellhead prices for natural gas which fact alone renders Peerless inapposite.
The Natural Gas Act was not involved in Peerless. In fact, the High Court was careful to point out "Whether the Gas Act authorizes the Power Commission to set field prices on sale by independent producers, or leaves that function to the states, is not before this Court." Examination discloses that Peerless no longer controls insofar as it holds that minimum price orders are not within the proscription of the Commerce Clause. Two major findings upon which the conclusion was based in Peerless, are not here valid. At the time of the decision in Peerless, the Natural Gas Act had not been held to be applicable to independent producers. There was thus no expressed need for uniformity of regulation in the producer field. In Phillips Petroleum Company v. Wisconsin, et al., 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, the uniformity of regulation provided for by the Natural Gas Act was unequivocally made applicable to producers. Moreover, the Court observed that it had loosened the constitutional restrictions on state activities affecting interstate commerce, in the absence of federal regulation.
The Court said in Peerless, that "the wellhead price of gas is but a fraction of the price paid by domestic consumers at the burner-tip, so that the field price as herein set may have little or no effect on the domestic delivered price." In Phillips, however, the Court declared that the "rates charged may have a direct and substantial effect on the price paid by the ultimate consumers." And be it noted that Mr. Justice Clark, who spoke for the Court in Peerless, dissented in Phillips.

PRE-EMPTION
We now turn to the second question of whether the Orders of the Oklahoma Corporation Commission conflict with the jurisdiction of the Federal Power Commission under the Natural Gas Act of 1938, as amended.
*536 The Supremacy Clause of the Federal Constitution provides [Art. 6, cl. 2] that the laws made in pursuance of it shall be the supreme law of the land, notwithstanding state laws to the contrary. The courts will attach no validity to a state law which frustrates the effectiveness or is contrary to a federal statute. "Our prior cases on preemption," said the Supreme Court in City of Burbank v. Lockheed Air Terminal, 1973, 411 U.S. 624, at 638, 93 S.Ct. 1854 at 1862, 36 L.Ed.2d 547, "are not precise guidelines in the present controversy, for each case turns on the peculiarities and special features of the federal regulatory scheme in question."
Deciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict. Perez v. Campbell, 1971, 402 U.S. 637 at 644, 91 S.Ct. 1704, at 1708, 29 L.Ed.2d 233.
In a borderline case where congressional authority is not explicit, said the Supreme Court in Federal Power Commission v. Louisiana Power & Light Co., supra, "We must ask whether state authority can practicably regulate a given area and, if we find that it cannot, then we are impelled to decide that federal authority governs." 406 U.S. p. 631, 92 S.Ct. p. 1834.
The Natural Gas Act, 15 U.S.C. §§ 717-717w, declares that federal regulation of interstate commerce in natural gas is necessary in the public interest. The Act applies to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial or any other use, and to natural gas companies engaged in such transportation or sale. Each of these is an independent grant of jurisdiction. It expressly provides that it does not apply to the "production or gathering" or natural gas but the exemption relates to the physical activities, processes and facilities of production or gathering, and does not apply to sales affirmatively subjected to the jurisdiction of the Federal Power Commission. United Gas Improvement Co. v. Continental Oil Co., 1965, 381 U.S. 392, 85 S.Ct. 1517, 14 L. Ed.2d 466. Moreover, the courts have consistently held that "`production' and `gathering' are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first step of distribution." Northern Natural Gas Co. v. State Corporation Commission, 1963, 372 U.S. 84 at 90, 83 S.Ct. 646 at 650, 9 L.Ed.2d 601.
The primary duties of the Federal Power Commission under the Natural Gas Act are to underwrite reasonable rates and adequate service to consumers of interstate natural gas. In Atlantic Refining Co. v. Public Service Commission of New York, 1959, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312, the Court said:
[the] purpose of the Natural Gas Act was to underwrite just and reasonable rates to the consumers of natural gas . . . The heart of the Act is found in those provisions requiring initially that any "proposed service, sale, operation, construction, extension or acquisition . . . will be required by the present or future public convenience and necessity," § 7(e), 15 U.S.C. § 717f(e), and that all rates and charges "made, demanded, or received" shall be just and reasonable. § 4, 15 U.S.C. § 717(c) p. 388.
In Southern Louisiana Rate Cases v. Federal Power Commission, 1970, 5 Cir. 428 F.2d 407, rehearing, 5 Cir., 444 F.2d 125, cert. denied 400 U.S. 950, 91 S.Ct. 243, 27 L.Ed.2d 257, in reviewing orders of the Federal Power Commission setting maximum rates for wellhead sales of natural gas produced in the Southern Louisiana area, the Court said:
The purposes of The Act encompass not only reasonably low rates but maintenance of adequate service for *537 the consumer . . . p. 435 [Emphasis ours]
In Memphis Light, Gas & Water Div. v. Federal Power Commission, 1972, 149 U.S.App.D.C. 238, 462 F.2d 853, the Court observed:
Clearly, it is the duty of FPC, under its Congressional mandate, the Natural Gas Act, to enforce the continued availability of natural gas in interstate commerce for eventual sale to the consumer at the lowers practicable rate. p. 858.
Under 15 U.S.C. § 717(b) the Federal Power Commission is vested with jurisdiction over (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale. Federal Power Commission v. Louisiana Power & Light Co., supra, 406 U.S. at 636, 92 S.Ct. 1827. The Orders here in question touch the second category of the powers of the Federal Power Commission.
The substantive standard for jurisdictional sales rates is contained in Section 4 of the Natural Gas Act, 15 U.S.C. § 717c which provides in pertinent part that:
All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.
Section 5(a) of the Act, 15 U.S.C. § 717d(a), grants the Commission, inter alia, authority to investigate all such jurisdictional rates and to establish the appropriate rates upon a finding after hearing that the existing rates are unjust, unreasonable, unduly discriminatory, or preferential.
The Natural Gas Act was enacted in 1938, but was not made applicable to independent producers of natural gas until 1954. See Phillips Petroleum Company v. Wisconsin, 1954, 347 U.S. 672, 74 S. Ct. 794, 98 L.Ed. 1035. The Supreme Court essentially there found that independent producers of natural gas which is sold in interstate commerce are "natural-gas companies" within the meaning of the Natural Gas Act, and, accordingly, the rates of their sales for resale are subject to regulation by the Federal Power Commission.
Pursuant to its responsibilities under the Natural Gas Act, as interpreted by the Supreme Court in Phillips, the Federal Power Commission has established certain geographical producing areas and has determined the rates for all jurisdictional sales of gas by producers within such areas. The history of the producer rate legislation is summarized by the Supreme Court in the Permian Basin Area Rate Cases, 1968, 390 U.S. 747 at 755-758, 88 S.Ct. 1344, 20 L.Ed. 2d 312 and need not be repeated herein.
The Court finds that the questioned Orders of the Oklahoma Corporation Commission conflict with the jurisdiction of the Federal Power Commission under the Natural Gas Act. The unequivocal language of the Orders shows that the Oklahoma Corporation Commission is dissatisfied with the Federal Power Commission's producer rate regulation and that Defendant would, therefore, like to substitute its judgment for that of the Plaintiff regarding such rates. Order No. 93,381 reads in part as follows:
The present intrinsic value of Oklahoma gas is more than .60 cents per MCF at the wellhead.
The wellhead price for approximately 98 percent of all Oklahoma gas varies from .03 cents per MCF to .32 cents per MCF, and the average is .15 cents to .17 cents. Wellhead price does not respond readily to market supply and demand factors due to a combination *538 of long term gas contracts and federal price regulation.
. . . the Federal Power Commission entered the picture, and undertook to regulate the price of gas sold in interstate commerce. It has . . . refused to recognize that a field price may be too low. Thus, if a producer has a bad contract, he must live with it; but if he drives a good bargain, he may see the price cut back. Such a philosophy of regulation stifles development, and eventually harms the very consumers it purports to protect, as events have proved.
It is obvious that the Orders in question would circumvent the Plaintiff's regulatory jurisdiction. We find also that the purpose of the Orders is to establish a minimum price at which gas may be sold in interstate commerce. The Orders are not conservation or waste prevention measures for, indeed, the sale of natural gas in interstate commerce is unrestricted by these orders provided the minimum price levels are satisfied. We find from the evidence that the objective of the orders is not to prevent physical waste or to protect correlative property rights [Cf. Choctaw Gas Co. v. Corporation Commission of Oklahoma, 1956, Okl., 295 P.2d 800], but rather to increase the price which Oklahoma producers may receive from interstate pipelines before natural gas may move in interstate commerce.
The State has no authority, either directly or indirectly, to fix the price at which natural gas is sold in interstate commerce. The Supreme Court stated in Northern Natural Gas Co. v. State Corporation Commission of Kansas, 1963, 372 U.S. 84, 83 S.Ct. 646, 9 L. Ed.2d 601 that:
. . . [O]ur inquiry is not at an end because the orders do not deal in terms with prices or volumes of purchases, cf. Dayton-Goose Creek R. Co. v. United States, 263 U.S. 456, 478, 44 S.Ct. 169, 172, 68 L.Ed. 388. The Natural Gas Act precludes not merely direct regulation by the States of such contractual matters . . .
The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, Natural Gas Pipeline Co. v. Panoma Corp., 349 U. S. 44, 75 S.Ct. 576, 99 L.Ed. 866, or for state regulations which would indirectly achieve the same result. pp. 90-91, 83 S.Ct. p. 650.
In Phillips Petroleum Co. v. Wisconsin, supra, it was argued that Peerless and Phillips Petroleum Co. v. Oklahoma, 1950, 340 U.S. 190, 71 S.Ct. 221, 95 L. Ed. 204, established that the states could regulate interstate sales, and, therefore, such sales were not within the gap which the Natural Gas Act was intended to fill. The Supreme Court, however, was of a different view:
Those cases upheld as constitutional state minimum price orders, justified as conservation measures, applying to sales of natural gas in interstate commerce. But it is well settled that the gap referred to is that thought to exist at the time the Natural Gas Act was passed, and the jurisdiction of the Commission is not affected by subsequent decisions of this Court which have somewhat loosened the constitutional restrictions on state activities affecting interstate commerce, in the absence of conflicting federal regulation. [Citation omitted] The Federal Power Commission did not participate in the Cities Service and Phillips Petroleum cases, the appellants there did not assert a possible conflict with federal authority under the Natural Gas Act, and consequently we expressly refused to consider at that time "[w]hether the Gas Act authorizes the Power Commission to set field prices on sales by independent producers, or leaves that function to the states . . ."
Shortly after the decision in Phillips the Supreme Court was called upon in Natural Gas Pipeline Co. v. Panoma *539 Corporation, 1955, 349 U.S. 44, 75 S.Ct. 576, 99 L.Ed. 866 to review the validity of certain minimum price orders of the Oklahoma Corporation Commission. The Supreme Court of Oklahoma had affirmed the orders, reasoning that they were primarily conservation measures, rather than pricing regulations, and that it was immaterial that they would have an incidental effect on prices. Natural Gas Pipeline Co. v. Corporation Commission, et al., 1954, Okl., 272 P.2d 425. The United States Supreme Court reversed, holding that the case was controlled by Phillips, supra. Holding essentially that Peerless was no longer authority for states to regulate interstate natural gas prices, the High Court stated:
We disagree with the contention of the appellees that Cities Service Gas Co. v. Peerless Oil and Gas Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190, and Phillips Petroleum Co. v. Oklahoma, 340 U.S. 190, 71 S.Ct. 221, 95 L.Ed. 204, are applicable here. In those cases we were dealing with constitutional questions and not the construction of the Natural Gas Act. The latter question was specifically not passed upon in those cases. p. 45, 75 S.Ct. p. 576.
In Federal Power Commission v. Transcontinental Gas Pipeline Corp., 1961, 365 U.S. 1, 9-20, 81 S.Ct. 435, 5 L.Ed.2d 377, it was held that the Federal Power Commission, through its certification power, could prevent the waste of gas committed to its jurisdiction. In so holding, the Court noted a distinction between "economic waste" and "physically wasteful practices". The former involves a general monitoring of natural gas supply through manipulations of rate structure and determinations of gas use priorities, while the latter involves such matters as improper well spacing and the flaring of unused gas. The regulation of "economic waste" is properly within the jurisdiction of the Federal Power Commission, leaving the state authority to regulate "physically wasteful practices," so long as such do not interfere with Federal jurisdiction.
In Northern Natural Gas Co. v. State Corporation Commission of Kansas, 1965, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed. 2d 601, the Kansas Corporation Commission had issued orders which required an interstate pipeline company to purchase natural gas ratably from all wells connecting to its pipeline system. The United States Supreme Court reversed an affirmance of the order by the Kansas Supreme Court. In so doing, the High Court held that a purpose, "however legitimate to conserve natural resources, does not warrant direct [or indirect] interference by the States with the price[s] of natural gas wholesales in interstate commerce." [Italics ours] The orders were struck down because they necessarily impaired the ability of the Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas and to achieve the uniformity of regulation which was the objective of the Natural Gas Act.
The problem in Northern Natural, supra, as here, was:
. . . not as to the existence or even the scope of a State's power to conserve its natural resources; the problem is only whether the Constitution sanctions the particular means chosen by . . . [the state] to exercise the conceded power if those means threaten effectuation of the federal regulatory scheme. [Emphasis supplied]
The Defendant also relies upon Section 1(b) of the Natural Gas Act, 15 U. S.C. § 717(b), which states in part that the provisions of the Act "shall not apply . . . to the production and gathering of natural gas." Accordingly, Order No. 93,381, paragraph 19, states that:
All we do is prohibit the production of gas under circumstances which we find will produce waste; and to prevent that waste, we will order wells to be shut in. Our Order and our regulatory *540 action is complete before any sale takes place.
The state courts, which were reversed in Panoma and Cities Service, had relied upon identical rationale in upholding state minimum price orders. The Oklahoma Supreme Court had observed in affirmance that "the sale is made before any movement of any kind starts and before any thing in the nature of interstate commerce occurs." supra, 272 P.2d at 431. Similarly, the Kansas Supreme Court had observed the order of the Kansas Commission "fixed a minimum price to be paid for gas before cessation of production." 180 Kan. 454, 304 P.2d 528 at 535.
In the case at bar, the Defendant seeks to do precisely what the United States Supreme Court held that the Kansas Corporation Commission could not do. Here, as there, a certain price level must be satisfied as a condition precedent to production. The High Court said in the Northern, supra, case, "It has been consistently held that `production' and `gathering' are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution." The Defendant is not concerned herein with the mere physical problem of production; it is concerned with the price of the sale.
The conflict between the orders in question and Federal jurisdiction is heightened when one considers the choice facing many producers. In situations where the minimum Oklahoma rate exceeds the applicable area rate established by the Federal Power Commission, the producer runs the risk of having a well shut in if he complies with the Federal Power Commission order. For example, Opinion No. 586, issued by the Federal Power Commission on September 18, 1970, establishes 14,25 cents per MCF as the maximum base rate in the Panhandle and Hugoton fields of the Hugoton-Anadarko area for gas sold on or after July 1, 1972, under contracts dated prior to November 1, 1969. On the other hand, if he sells at the Oklahoma minimum price which exceeds the applicable area rate of the Federal Power Commission, he may be in violation of orders under the Natural Gas Act, and thereby liable for fines and penalties under Section 21, 15 U.S.C. § 717t.
Jurisdictional producers cannot comply with both the Federal and state regulatory schemes. Where such a situation obtains, state regulation is preempted. As the Supreme Court observed in Florida Lime & Avocado Growers, Inc. v. Paul, 1963, 373 U.S. 132, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248:
A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulation is a physical impossibility for one engaged in interstate commerce, . . . p. 142.
In Northern, supra, the Court had said:
. . . [A]lthough collision between the state and federal regulation may not be an inevitable consequence, there lurks such imminent possibility of collision in orders purposely directed at interstate wholesale purchasers that the orders must be declared a nullity in order to assure the effectuation of the comprehensive federal regulation ordained by Congress. 372 U. S. p. 92, 83 S.Ct. p. 651.
While the preemption issue is concerned primarily with price regulation of interstate natural gas sales, the Orders in question invalidly infringe upon the Federal Power Commission's abandonment jurisdiction, to the extent that such orders contemplate a shutting in of gas wells that do not meet the minimum rate levels. Section 7(b) of the Natural Gas Act, 15 U.S.C. § 717f(b), provides:
No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the *541 Commission first had and obtained . . . [Emphasis supplied]
The Natural Gas Act leaves no room for direct state regulation of the prices of interstate wholesales of natural gas. Likewise it leaves no room for indirect state regulation which accomplishes the same result, even though the regulation be framed to achieve ends which ordinarily fall within the ambit of state power. It matters not that it be the state's only means of attaining its ends. In Northern Natural Gas, etc., supra, the Court said:
Of course, the Kansas method before us would fail, for the reasons given, even if it were Kansas' only means of attaining these ends. 372 U.S. p. 94, 83 S.Ct. p. 652.
The Natural Gas Act even embraces sales of leasehold interests in a proven and substantially developed natural gas field. Such are "sales" of natural gas within the meaning of the Act. In speaking for the Court in United Gas Improvement Co., supra, Mr. Justice Harlan, who spoke for the Court, said:
In Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L. Ed. 1035, the Court held that Federal Power Commission jurisdiction under the Natural Gas Act, as amended 52 Stat. 821, 15 U.S.C. § 717 et seq. (1964 ed.), extended to what are described colloquially and perhaps somewhat loosely as "wellhead" sales of natural gas by producers to interstate pipeline companies for resale in interstate commerce. The issue in the present cases is whether sales to an interstate pipeline company of leases covering proven and substantially developed reserves of gas to be sold in interstate commerce are also subject to Commission jurisdiction. We hold that they are. 381 U.S. pp. 394-395, 85 S.Ct. p. 1519.
We find the conclusion of federal preemption inescapable. The challenged Orders "stand as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Natural Gas Act. Perez v. Campbell, supra, 402 U.S. p. 649, 91 S.Ct. p. 1711.
We now turn our attention to the third issue.

JUSTICIABLE CONTROVERSY
The Defendants argue that the Complaint does not present a justiciable controversy or cause of action. In support thereof they urge that the powers of the Plaintiff and the Oklahoma Corporation Commission are separate and exclusive and that neither the Plaintiff "nor its functions are directly affected by the Orders complained of."
Mere separateness and exclusiveness of the powers of the two commissions is not determinative of whether a justiciable controversy exists. Although the Natural Gas Act provides that it shall not apply to "the production or gathering of natural gas," the governance thereof being left to the several states, "Congress is without power to enlist state cooperation in a joint federal-state program by legislation which authorizes the States to violate" the commerce clause of the Constitution. Shapiro v. Thompson, 1969, 394 U.S. 618, 641, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600; Townsend v. Swank, 1971, 404 U.S. 282, 291, 92 S.Ct. 502, 30 L.Ed.2d 448. It thus appears that state action which allegedly impairs federal superintendence of the field and thereby violates the federal Constitution would raise a justiciable issue. The decided cases so hold.
It was suggested, in Florida Avocado Growers v. Paul, 1962, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248, that the coexistence of federal and state regulatory legislation should depend upon whether the purposes of the two laws are parallel or divergent but the Supreme Court rejected the suggestion, saying:
The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or *542 different objectives. p. 142, 83 S.Ct. p. 1217.
The third Article of the Federal Constitution limits the federal judicial power to "cases" and "controversies". In holding that the Complaint in Aetna Life Insurance Company v. Haworth, et al., 1937, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, presented a justiciable controversy, Mr. Chief Justice Hughes, speaking for a unanimous Court, said:
A `controversy' in this sense [Article III] must be one that is appropriate for judicial determination. [Citations omitted] A justiciable controversy . . . must be definite and concrete, touching the legal relations of parties having adverse legal interests. [Citations omitted] It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. pp. 240-241, 57 S.Ct. p. 464.
In Northern Natural Gas Co. v. State Corporation Commission of Kansas, supra, the Court invalidated orders of the Kansas Commission which required an interstate pipeline company to purchase natural gas ratably from all wells connecting with its pipeline system in each gas field in Kansas. The Court held that the State orders were invalid in that they conflicted with the authority of the Federal Power Commission over the sale and transportation of natural gas in interstate commerce for resale. It was argued there, as here, that the State orders were valid in that they were for the conservation of natural resources  a traditional function of state power. In speaking for the Court, in invalidating the Order of the Kansas Commission, Mr. Justice Brennan said:
There is no doubt that the States do possess power to allocate and conserve scarce natural resources upon and beneath their lands. [Citing cases] . . . But the problem of this case is not as to the existence of even the scope of a State's power to conserve its natural resources; the problem is only whether the Constitution sanctions the particular means chosen by [a State] Kansas to exercise the conceded power if those means threaten effectuation of the federal regulatory scheme. 372 U.S. p. 93, 83 S.Ct. p. 652.
. . . the federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas . . . or for state regulations which would indirectly achieve the same result. p. 91, 83 S.Ct. p. 650. [Emphasis added]
The propriety of entertaining the suits in Commonwealth of Pennsylvania v. State of West Virginia, 1923, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 was raised at the outset, but consideration was postponed by the Supreme Court to the final hearing. In granting the injunctive relief prayed for, the Court said:
The first question is whether the suits involve a justiciable controversy between States in the sense of the judiciary article of the Constitution. We are of the opinion that they do and that every element of such a controversy is present.
Each suit presents a direct issue between two states as to whether one may withdraw a natural product, a common subject of commercial dealings, from an established current of commerce, moving into the territory of the other. The complainant state asserts and the defendant state denies that such a withdrawal is an interference with interstate commerce forbidden by the Constitution. This is essentially a judicial question. p. 591, 43 S.Ct. p. 663.

STANDING TO SUE
The Court now turns to the Question of whether "the Federal Power Commission has standing to initiate or pursue this action against the Defendants." The contention of the Defendant on this *543 issue is two-fold, i. e., that the Federal Power Commission lacks authority and that Defendant Oklahoma Corporation Commission enjoys statutory immunity from suit.
The Defendant argues that no statute "expressly or impliedly authorizes that Commission to sue . . . to test the validity of any statute or any . . . order adopted or entered by a state agency." While there is no express provision in the Natural Gas Act authorizing the suit, the Court holds, however, that Congress has fashioned enough federal law to authorize this suit and, if not, that the Plaintiff has the implied authority to bring and maintain this action for injunctive relief.
In United States v. Republic Steel Corp. et al., 1960, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, the Court held that a Federal District Court was authorized to grant the injunctive relief sought by the United States to compel a Defendant to remove obstructions which it had placed in the Calumet River, and to restore the depth of the channel, absent statutory authority to maintain the action. It appeared that Section 10 of the Rivers and Harbors Act of 1890, as amended, prohibited the "obstruction [of] the navigable capacity of any of the waters of the United States" and that "it shall not be lawful to excavate or fill . . . the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same." In upholding injunctive relief, notwithstanding the argument that the Plaintiff lacked enabling authority to maintain the action, the Court held that the test is whether the United States has "an interest to protect and defend" and said:
Congress has legislated and made its purpose clear; it has provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation. p. 492, 80 S. Ct. p. 890.
In N. L. R. B. v. Nash-Finch Co., etc., 1971, 404 U.S. 138, 92 S.Ct. 373, 30 L. Ed.2d 328, the Court held that N.L.R.B., for the purpose of preventing frustration of the National Labor Relations Act, had implied authority to obtain a federal injunction against state court action pre-empted by the Act. In holding that N.L.R.B. had implied authority to sue to enjoin to protect the national interest the Court said:
The fact that the Board is given express authority to seek enforcement of its orders in some sections of the Act is not persuasive that the Act expresses a policy to bar the Board from enforcing the national interests on other matters. The instances where the Board is given explicit authority to seek the aid of federal courts are not exclusive examples . . . They are only particularized instances of specific enforcement devices relating to specified orders, not a denial by implication that the Act and the Board would not be entitled to federal aid or protection in other instances. [Citing cases] The exclusiveness of the federal domain is clear; and where it is a public authority that seeks protection of that domain, the way seems clear. For the Federal Government and its agencies, the federal courts are the forum of choice. For them, as Leiter, [1957, Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 7 L.Ed.2d 267] indicates, access to the federal courts is "preferable in the context of healthy federal-state relations." p. 147, 92 S.Ct. p. 378.
What was said and held in N. L. R. B. v. Nash-Finch Co., etc., supra, is equally applicable and suffices here. The instances in which the Natural Gas Act authorizes the Plaintiff to seek the aid of federal courts are not exclusive. They do not by implication constitute a denial to the Plaintiff to seek aid of the courts in other instances where the United States has an interest *544 to protect and defend and injunctive relief is appropriate to that end.
In the absence of a command from the Congress to the contrary, the power of this Court to issue the injunction is clear. As the Court said in Capital Service, Inc., et al. v. N. L. R. B., 1954, 347 U.S. 501, 74 S.Ct. 699, 98 L. Ed. 887:
Federal courts seek to avoid needless conflict with state agencies and withhold relief by way of injunction where state remedies are available and adequate . . . But where Congress, acting within its constitutional authority, has vested a federal agency with exclusive jurisdiction over a subject matter and the intrusion of a state would result in conflict of functions, the federal court may enjoin the state proceedings in order to preserve the federal right. 504, 74 S.Ct. 702.

IMMUNITY TO SUIT OF DEFENDANT AS AGENCY OF THE STATE
The Defendant argues in support of its contention that the Plaintiff lacks authority to institute and pursue this action, that said Defendant is an agency of a state and, as such, is immune to suit under 15 U.S.C. § 717a. Section 717s of 15 U.S.C. provides that "whenever it shall appear to the Commission that any person is engaged . . . in any acts or practices which constitute . . . a violation of the provisions of this chapter . . . or any . . . order thereunder, it may . . . bring an action . . . to enjoin such acts or practices and enforce compliance with this chapter or any . . . order thereunder . . ." [Emphasis added]
The statutory word "person" and other words and terms are defined by § 717a. These are (1) person, (2) corporation, (3) municipality, (4) state, (5) natural gas, (6) natural gas company, (7) interstate commerce, (8) state commission, and (9) Commission. Sub-section (1) reads as follows: "`Person' includes an individual or a corporation." Sub-section (2) provides that "`Corporation' includes any corporation . . . but shall not include municipalities as hereinafter defined." Subsection (3) provides that "`Municipality' means a city, county, or other political subdivision or agency of a State." [Emphasis added]
The definitional verbs in § 717a are not uniform. Sub-sections (1) and (2) use the verb "includes". On the other hand the definitional verb in all other definitions, i. e. sub-sections (3) through (9), is "means", e. g. "`Natural gas' means either natural gas unmixed, or any mixture of natural and artificial gas."
The lack of uniformity in the definitional verbs in 15 U.S.C. § 717a is significant. The definitional verbs "means" and "includes" are neither identical nor equivalent in meaning. "Means" is a verb of limitation. "Includes" is a verb of enlargement and not a verb of limitation or of enumeration. Phelps Dodge Corporation v. N. L. R. B., 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L. Ed. 1271. The likelihood that the definitional verbs were so understood and were so used in the Natural Gas Act is demonstrated by the use of "includes" in defining "corporation" in sub-section (2) and providing therein that the word "shall not include municipalities as hereinafter defined" and thereafter, in subsection (3) declaring that "`municipality' means a city, county or other political subdivision or agency of a State."
An "agency of a State" is excluded from the definition of "corporation" but is not excluded from the word "person." Thus, in declaring that "person includes an individual" the statute uses a verb of enlargement. Whether the Defendant Oklahoma Corporation Commission is a non-individual "person" against which the Plaintiff may proceed, is to be determined by the "legislative environment." The reported cases so hold.
In Ohio v. Helvering, 1934, 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307, a federal *545 statute levied a tax upon "persons" selling intoxicating liquor. The tax statute defined "person" to "includ[e] a partnership, association, company, or corporation, as well as a natural person." The State of Ohio moved for leave to file in the Supreme Court a bill of complaint invoking the original jurisdiction of that Court seeking to enjoin the enforcement against it of the federal statutes imposing taxes upon dealers in intoxicating liquors. In denying the motion for leave to file the bill of complaint, the Attorney General of Ohio argued that the State was not a "person" within the definition of the statute, but the Supreme Court held to the contrary and said:
We find no merit in the further contention that a state is not embraced within the meaning of the word "person" as [used in the applicable statute.] By section 205 the tax is levied upon every "person who sells, etc."; and by section 11 the word "person" is to be construed as meaning and including a partnership, association, company or corporation, as well as a natural person. Whether the word "person" or "corporation" includes a state or the United States depends upon the connection in which the word is found. p. 370, 54 S.Ct. p. 727.
In Georgia v. Evans, et al., 1942, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346, the Court held that a State is a "person" within the meaning of § 7 of the Sherman Act and entitled to sue for treble damages under the Act. In so holding, Mr. Justice Frankfurter, who spoke for the Court, said:
Whether the word "person" . . . includes a State or the United States depends upon its legislative environment. Ohio v. Helvering, 292 U.S. 360, 370, 54 S.Ct. 725, 727, 78 L.Ed. 1307. The Cooper case [United States v. Cooper Corporation, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071] recognized that "there is no hard and fast rule of exclusion. The purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids to construction which may indicate an intent, by the use of the term, to bring state or nation within the scope of the law." pp. 604-605, 62 S.Ct. 974. [Compare United States v. Shirey, 1959, 359 U.S. 255, 79 S.Ct. 746, 3 L.Ed.2d 789]
For the foregoing reasons the Court finds that Defendant Oklahoma Corporation Commission is not immune to suit by the Plaintiff.
The Intervening Defendants contend that the Plaintiff is without standing to maintain the action because there is no allegation or showing made that the Plaintiff has complied with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., which requires all federal agencies, in performing their respective functions, to be responsive to the possible environmental consequences in taking "major Federal action" and prescribes certain procedural measures to be taken.
Plaintiff contends that no detailed environmental impact statement was requisite to the institution of this action. We find no judicial holding that the institution of an action by a federal agency to protect its jurisdiction constitutes "major Federal action significantly affecting the quality of the human environment." The Intervening Defendants rely on National Helium Corporation v. Morton, CA 10, 1971, 455 F.2d 650, but the case is clearly distinguishable. There an injunction issued restraining the Secretary of the Interior from cancelling contracts for the extraction and sale of helium to the federal government as applied to helium in the natural gas resources of the Hugoton Field and said to be the world's largest supply of natural gas. The case involved the National Helium Act, 50 U.S.C. § 167 et seq., and the National Environmental Policy Act, supra. The trial court said: "Virtually the entire national program of helium conservation under the National Helium Act is involved." (DC Kan., 1971) 326 F.Supp. 151, 152. In issuing the injunction *546 the Court found that the Secretary of the Interior had not complied with the National Environmental Policy Act and also had ignored the regulations of his Department.
As respects the National Environmental Policy Act, the Court noted in Morton, supra, that the Secretary was taking affirmative "major Federal action" within an area of his jurisdiction under the National Helium Act, supra. In the case at bar, the Plaintiff seeks injunctive relief against orders issued by the Defendant. The National Environmental Policy Act is required only as to "major Federal action." The phrase stands undefined in the statute. A major federal action, said the Court in National Resources Defense Council, Inc. v. Grant, DC NC, 1972, 341 F.Supp. 356, 366, "is federal action that requires substantial planning, time, resources, or expenses." The Council on Environmental Quality had established guidelines as to what constitutes "major federal action." Nothing therein contained makes reference to the filing of an action in the federal courts to enjoin state regulation in an area which allegedly has been preempted by federal law or which allegedly is invalid under the federal Constitution. Compare the observations of the Court respecting NEPA in City of Burbank v. Lockheed Air Terminal, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547, decided May 14, 1973, United States Supreme Court.

ABSTENTION
We now decide whether this Court should abstain pending a determination by the Oklahoma Supreme Court of the appeals now pending therein under consolidated cases No. 46114 et seq., which involve these very orders. The Defendant relies solely on Railroad Commission of Texas, et al v. Pullman Co., 1941, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, which is inapposite.
The doctrine of abstention is an extraordinary and narrow exception to the duty of a court to adjudicate a controversy before it. The doctrine is inapplicable where a state ruling on local law cannot settle the federal constitutional questions involved in the case. 32 Am.Jur.2d Federal Practice and Procedure, § 13, page 409. Such was the holding in Public Utilities Commission of Ohio, et al v. United Fuel Gas Co., et al., 1943, 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396. There the Ohio Commission asserted its jurisdiction over interstate wholesalers of gas, prior to the enactment of the Natural Gas Act who, after the enactment, became subject to the exclusive jurisdiction of the Federal Power Commission with respect to rates and charges of its interstate sales. The wholesalers ran the risk of receiving heavy fines and penalties if they failed to comply with the state regulatory order. Interference with interstate commerce was plain and unequivocal. Thus it was that Mr. Justice Frankfurter, speaking for the Court [Black, Douglas and Murphy dissenting] said:
Where the disposition of a doubtful question of local law might terminate the entire controversy and thus make it unnecessary to decide a substantial constitutional question, considerations of equity justify a rule of abstention. But where, as here, no state court ruling on local law could settle the federal questions that necessarily remain . . . considerations of equity require that the litigation be brought to an end as quickly as possible. p. 463, 63 S.Ct. p. 373.
The Commission Orders challenged in Pullman were assertedly invalid under local law. There is no such challenge in the case at bar. Moreover, in Pullman there was no asserted conflict between what the state regulatory agency sought to do and federal authority asserted by a federal regulatory agency, which is not our case. Abstention is not appropriate.
The foregoing shall constitute the Findings of Fact of the Court as is required by Rule 52(a), Federal Rules of Civil Procedure.