The STATE OF OKLAHOMA, By and Through Larry DERRYBERRY, Attorney General of the State of Oklahoma; David L. Boren, Governor of the State of Oklahoma; the State of Texas, by and through John L. Hill, Attorney General of the State of Texas; Dolph Briscoe, Governor of the State of Texas; the State of Louisiana, by and through William J. Guste, Jr., Attorney General of the State of Louisiana; Edwin Edwards, Governor of the State of Louisiana; Shirley McNamara, Secretary of the Louisiana Department of Revenue and Taxation, and William C. Huls, Secretary of the Louisiana Department of Natural Resources, Plaintiffs,

The State of Wyoming, By and Through its Attorney General; Ralph L. Harvey, Individually and as president of Marlin Oil Corporation, Intervening Plaintiffs,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Defendant,

United States of America, Intervening Defendant.

No. CIV–78–01251–T.

United States District Court, W. D. Oklahoma.

June 4, 1980.

Larry Derryberry, Jan Eric Cartwright, Attys. Gen., John F. Percival and Charles S. Rogers, Asst. Attys. Gen., Oklahoma City, Okl., for State of Oklahoma.

John L. Hill, Mark White, Attys. Gen., John W. Fainter, Jr., Ted L. Hartley, David Hughes and Stuart Fryer, Asst. Attys. Gen., Austin, Tex., for State of Texas.

William J. Guste, Jr., Atty. Gen., Gary L. Keyser, David C. Kimmel and Carmack M. Blackmon, Asst. Attys. Gen., Baton Rouge, La., for State of Louisiana.

John D. Troughton, Atty. Gen., Thomas J. Carroll, III and Bernard Broderick, Asst. Attys. Gen., Cheyenne, Wyo., for State of Wyoming.

William Pannill, Houston, Tex., for Ralph L. Harvey and Marlin Oil.

Howard E. Shapiro, Sol. and Joanne Leveque, Atty., Federal Energy Regulatory Commission, Washington, D. C., Larry D. Patton, U. S. Atty. and Stan Twardy, Asst. U. S. Atty., Oklahoma City, Okl., Barbara Allen Babcock, Asst. Atty. Gen., Dennis G. Linder, Paul A. Gaukler, Dina R. Lassow, and C. Max Vassanelli, Attys., Dept. of Justice., Washington, D. C., for defendant and intervening defendant.

Daniel J. Papeo, Washington, D. C., Gregory Meyer, Local Counsel, Oklahoma City, Okl., for Washington Legal Foundation.

David E. Engdahl, Engdahl, Renzo & Reid, Denver, Colo., for David E. Engdahl.

Toney Anaya, Atty. Gen. of the State of New Mexico, Santa Fe, N. M., filed a Complaint in Intervention on January 8, 1979, it was dismissed on April 19, 1979.

## MEMORANDUM OPINION

RALPH G. THOMPSON, District Judge.

The Natural Gas Policy Act of 1978[1] was signed into law on November 9, 1978, along with four other bills, as part of a comprehensive energy program. Broadly characterized, the Natural Gas Policy Act (hereafter NGPA or the Act) is intended to encourage production by providing price incentives for the exploration and production of new gas sources, with eventual deregulation of certain wells, while facilitating interstate transportation and supply. The NGPA represents the first federal regulation of wholly intrastate gas.

Oklahoma, Louisiana, and Texas challenge the NGPA as unconstitutional, alleging, in their complaint as amended and supplemented (hereafter amended complaint) that all provisions thereof which purport to affect intrastate gas (§§ 2, 101–103, 105–

---

1. 15 U.S.C. §§ 3301, et seq.

109, 121, 122, 201–206, 301–304, 311–315, 504, and 602) exceed the power of Congress to regulate "commerce among the several states," and abrogate the Tenth Amendment, as well as being a denial of equal protection and due process (count I). Plaintiff States allege that the provisions of the Act which "attempt to coerce plaintiffs" into enactment of legislation, assignment of state employees, and expenditure of state funds for the purpose of implementing federal policy (§§ 304, 312, 501, 503–506) are an invasion of state sovereignty and intergovernmental immunity, a violation of the constitutional guaranty of a republican form of government, a denial of equal protection, due process, and Tenth Amendment guarantees, and in excess of Congress' commerce clause power (count II). The states of Texas and Oklahoma further allege that federal regulation of natural gas produced from the public lands within those states violates the terms of their admission into the Union (count III)[2]. Count IV of plaintiffs' amended complaint alleges that all provisions of the Act which authorize the allocation and distribution of intrastate gas into interstate pipelines (§§ 201–206, 301–304, 311–315, 504) exceed Congress' commerce clause power, and invade state sovereignty and immunity, as provided in the Tenth Amendment, equal protection, and due process clauses. Plaintiffs pray for a declaratory judgment that the named provisions of the Act are unconstitutional.

The complaint in intervention of intervening plaintiff Wyoming raises substantially the same issues.[3] Intervening plaintiff Ralph Harvey, individually and as president of Marlin Oil Corporation, also attacks the regulation of intrastate gas as exceeding Congress' commerce clause power. Additionally, Harvey asserts that certain subsections of § 102 which provide price ceilings for certain categories of gas lack any rational basis and are violative of due process. Harvey alleges that § 106(b) arbitrarily discriminates against individuals in favor of states and Indian tribes, in violation of equal protection and due process guarantees, and that the bifurcated system of administrative review of price determination provided in § 503, i. e., initial determination in the appropriate state agency with review in the Federal Energy Regulatory Commission and the United States Courts of Appeals, violates state sovereignty and the Tenth Amendment. Harvey prays that the referenced sections be declared unconstitutional.

Defendant Federal Energy Regulatory Commission (FERC) and intervening defendant United States (hereafter defendants) have answered, asserting certain defenses and denying plaintiffs' claims.

Pursuant to agreement of counsel at pretrial conference, simultaneous motions were filed by all parties. Defendants have moved to dismiss the claims of plaintiffs with respect to certain sections of the Act, asserting that those claims are either not ripe for review or are not properly before this Court. Defendants have further moved to dismiss the claims of intervening plaintiff Harvey (with the exception of his claim that the regulation of intrastate gas exceeds Congress' commerce power), alleging that he has no standing to raise the issues in his complaint. Defendants have moved for summary judgment on the remaining claims of plaintiffs. Plaintiff States, joined by intervening plaintiff Wyoming (hereafter plaintiff and intervening plaintiff States will be referred to as plaintiffs) have moved for summary judgment on their amended complaint, and Harvey has moved for summary judgment on his complaint in intervention. Responses to the motions have been filed by adverse parties. Amicus briefs have been received from the Washington Legal Foundation and from David Engdahl. Oral arguments on the motions were had, the issues have been exhaustively briefed and the Court herein renders its opinion on all pending motions.

---

2. Oklahoma has apparently abandoned its allegation in this respect. See note 13, infra.

3. New Mexico was permitted to intervene but dismissed its complaint prior to the filing of responsive pleading by defendant. Rule 15(a), Federal Rules of Civil Procedure.

## The Act

Brief summaries of both the Natural Gas Policy Act and prior controls over the natural gas industry will perhaps be helpful at the outset.

In 1938, the Natural Gas Act (NGA) [4] was enacted by Congress, regulating the transportation and sale of natural gas in interstate commerce. The NGA left certain matters involving natural gas production and sale unregulated, particularly gas produced, sold, and consumed within a state. The Federal Power Commission [5] regulated many aspects of interstate gas, including pricing following the decision of the Supreme Court in *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). As part of the regulatory scheme, once gas had been dedicated to the interstate market, it could not be withdrawn without FPC approval. Wholly intrastate gas was not subject to FPC price regulation and the price of such gas has not been regulated in any of the plaintiff States, resulting generally in higher prices of intrastate gas. The plaintiff States assert that the unregulated intrastate market is highly advantageous to the interstate market, as higher intrastate prices encourage new production and development, creating a surplus which is diverted into the interstate market once intrastate demand is met, and further discouraging wasteful consumption. Defendants assert, and the legislative history of the NGPA recites,[6] that unregulated intrastate prices have resulted in shortages of natural gas in nonproducing states, as the intrastate market, with its higher price advantage, is able to secure the lion's share of new gas production. The NGPA was Congress' solution to the necessity of encouraging production and exploration of new natural gas sources and maintaining adequate supplies of natural gas in the interstate market.[7]

Title I of the Act establishes price ceilings for all first sales of natural gas without regard to its interstate or intrastate character. These prices are by reference to a base period, with adjustment monthly for inflation and, in some cases, for real growth. Section 102 sets maximum rates for newly discovered gas which meets certain qualifications; § 103 sets rates for new, onshore production wells; § 104(b)(1) defines ceiling rates for gas dedicated to interstate commerce and subject to FERC's jurisdiction prior to the Act; § 105(b)(1) provides that gas sold under intrastate contracts in effect on the date of passage of the Act will be as provided in the contract, adjusted for inflation, or the "new" gas price; § 106 sets rates for "rollover contracts", i. e., contracts for the first sale of gas subject to a contract in effect on the date of passage of the Act, but which subsequently expired, with higher rates for interests held by states or Indian tribes; §§ 107 and 108 set higher rates for certain high cost natural gas, e. g., gas from deep wells or low producing wells; § 109 sets maximum prices for all natural gas not covered by the previous sections. Gas qualifying in more than one category is entitled to the highest price (§ 101(b)(5)) and, except for gas covered by §§ 104, 105, or 109, higher rates provided in the other categories may be received only after a federal or state agency has made a determination of applicability of the specific category claimed. Section 121 provides for deregulation of certain categories after January 1, 1985, subject to the President's limited authority, contained in § 122, to impose temporary price controls beyond that date.

Title II of the Act provides for a pass-through of the costs incurred by interstate pipelines to industrial users, requiring FERC to adopt rules imposing incremental pricing on pipelines so that costs exceeding

---

4. 15 U.S.C. §§ 717, et seq.

5. The FPC is now Federal Energy Regulatory Commission, under the Department of Energy Organization Act, 42 U.S.C. §§ 7101, 7134.

6. See discussion p. 25, infra.

7. S.Rep.No.95–436, 95th Cong., 2d Sess. 10, reprinted in (1978) U.S.Code Cong. & Admin. News, pp. 7855, 7858–59, H.R.Rep.No.95–496, Part IV, 95th Cong., 2d Sess. 96–97, reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 7855, 8540–41.

certain levels for specific categories of gas will be passed on to certain industrial consumers. This provision does not apply to intrastate pipelines, but the states are prohibited from enacting or enforcing any regulation which conflicts with the provisions of Title II.

Title IIIA of the Act authorizes the President to declare a natural gas supply emergency upon certain conditions, and defines the sources and the priority thereof from which the President may allocate gas for high priority use. Any emergency purchase or allocation order issued by the President preempts any state or local provision in conflict.

Title IIIB authorizes certain sales between interstate and intrastate pipelines and empowers FERC to impose certain requirements on contracts. Section 311 allows FERC to authorize transportation of natural gas by an interstate pipeline on behalf of any intrastate pipeline and vice versa, requiring rates that are just and reasonable as to transportation by interstate pipelines, fair and equitable as to transportation by intrastate pipelines. FERC may also authorize sales by intrastate pipelines to interstate pipelines, at a fair and equitable price, a formula for which is provided in § 311(b)(2). The duration of sales under this section is limited to two years, with two-year extensions if approved by FERC. Sales authorized under § 311 are subject to interruption by the seller or termination by FERC, with procedural requirements for both situations defined. Section 312 empowers FERC to allow the assignment by an intrastate to an interstate pipeline of its right to receive surplus natural gas. Determination of surplus is made by the appropriate state agency. Section 313 limits the effect of prices paid for high cost gas in certain emergency purchases in the application of indefinite price escalator clauses, defined in § 105(b). Section 314 makes unenforceable any contract provisions which prohibit commingling of contractual gas with gas subject to the NGA, prohibits sale to or transportation by an interstate pipeline or otherwise prohibits sale or transportation in interstate commerce, or terminates or grants an option to terminate contractual obligations as a result of commingling, sale or transportation. Section 315 allows FERC to establish minimum periods of duration of producer contracts for sale of natural gas, not to exceed the shorter of 15 years or the commercially producible life of the reservoir. FERC is required to exercise its authority so as not to discriminate between interstate and intrastate pipelines, and is precluded from giving advantage to an interstate pipeline which would have the effect of denying adequate supplies to intrastate pipelines systems. FERC is also required under this section to provide a right of first refusal for certain categories of natural gas production, and is authorized to require purchasers to file copies of all new contracts with FERC. Certain sections in Title IIIB, by reference to § 601 of the Act, clarify that the jurisdiction of FERC under the NGA does not extend to intrastate pipelines by virtue of sales or transportation of interstate gas under the Act.

Title IV is not attacked by plaintiffs and will not be summarized here.

Title V sets out procedures for administration, enforcement, and review. Section 501 provides that FERC shall administer the Act, except as provided otherwise in the Act. FERC is given authority to make rules and define terms, and may delegate its authority with respect to certain sections to the appropriate state agency, with the consent of that agency. Section 502 sets out the procedure for issuing rules or orders under the Act. Under § 503, a producer must obtain a determination of eligibility before getting the higher prices provided in Title I. The federal or state agency having regulatory jurisdiction over the production of natural gas is authorized to make such determinations, but may waive its authority by obtaining a written agreement with FERC, setting out the terms and conditions applicable to the waiver. Review of the decision of the state or federal agency is in FERC, which is to affirm if the decision is supported by substantial evidence. FERC may also remand the matter to the state or

federal agency, and any adversely affected party may appeal FERC's final findings to the United States Court of Appeals of the appropriate circuit. Any sales of natural gas pending determination under this section are subject to refund with interest if the maximum price is determined to be lower than that charged. Section 504 provides civil and criminal enforcement procedures for sales in excess of the maximum prices provided in the Act. Section 505 empowers the Secretary of Energy to intervene as a matter of right in any state agency proceeding relating to limitations on natural gas production. Sections 506 and 507 provide the procedure for judicial and congressional review, respectively.

Title VI defines the application of the NGA, and the jurisdiction of FERC under the NGA.

### Defendants' Motion to Dismiss

Plaintiffs States' complaints are largely directed to the existence and extent of congressional power to regulate wholly intrastate sales of natural gas. While plaintiffs' complaints specify the sections of the Act to which these arguments are directed, their briefs on the pending motions make only passing reference to the individual sections, and concentrate instead on the general question presented, i. e., Congress' power to impose *any* regulation on wholly intrastate sales. Defendants, on the other hand, have moved to dismiss certain of plaintiffs' claims, asserting that as to some of the sections attacked by plaintiffs, no justiciable case or controversy is presented. Specifically, defendants assert that plaintiffs' claims with respect to §§ 121, 201–206, 301–304, 311, 312, 315, and 505 should be dismissed. As to §§ 121, 301–304, and 505, defendants argue that plaintiffs' claims are purely speculative and hypothetical, as the contingencies upon which these sections may be activated have not yet occurred. Defendant argue that §§ 201–206, 311, 312, and 315 simply specify guidelines for the issuance of rules or orders by FERC. Until these rules or orders are promulgated, plaintiffs' claims are not ripe, defendants

argue, and furthermore, review of such rules and orders is properly in the Court of Appeals, as provided in § 506(b).

■ Although plaintiffs' complaint lists the sections of the NGPA which plaintiffs believe to be unconstitutional, plaintiffs' amended complaint is primarily a broad-based attack on the constitutionality of the Act under the Commerce Clause. In this context, plaintiffs' claims are neither speculative nor premature. There is instead a very specific and concrete question presented by plaintiffs' complaint, i. e., the power of Congress to regulate wholly intrastate gas. Plaintiffs are presently aggrieved by the operation of the Act and, therefore, the constitutional issues are ripe for decision. See *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634–2635, 57 L.Ed.2d 595 (1978); *United Public Workers v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947).

As to defendants' contention that those sections which merely authorize or direct FERC to enact rules are not ripe for review, it is Congress' commerce clause power which is at issue in this case, and whether Congress itself enacts controls over intrastate gas or delegates the responsibility to do so to FERC, the issue is clearly delineated and concrete. Plaintiffs do not allege that regulations promulgated under the Act do them specific harm, or are procedurally inadequate, but rather allege that Congress may not interfere with wholly intrastate activities, referring to specific sections of the Act only to clarify which portions they deem to be unconstitutional interference. In this context, the amended complaint of plaintiffs presents a case or controversy, ripe for consideration. Likewise, the claims as to these sections are not properly before the Court of Appeals, under § 506, because it is not judicial review of rules or orders of FERC which plaintiffs here seek, but rather a judicial determination of the extent of Congress' power to delegate to FERC any control over intrastate commerce. Defendants' motion to dismiss portions of the amended complaint and complaint in inter-

vention of the plaintiff States must therefore be denied.

### Plaintiff-Intervenor Harvey

Defendants have moved to dismiss portions of the complaint in intervention of plaintiff-intervenor Ralph Harvey, individually and as president of Marlin Oil Corporation (hereafter Harvey), on the ground that Harvey lacks standing to litigate the issues raised. Specifically, defendants allege that Harvey lacks standing to litigate those issues in paragraphs 5 through 7 of his complaint. Briefly summarized, Harvey's allegations are (1) that the statutory price classifications of various categories of natural gas, found in §§ 102(c)(1)(B), 102(b)(2), and 121(a)(2 and 3) of the Act, have no rational basis and are a violation of the due process clause. (Complaint in Intervention, ¶ 5); (2) the maximum prices in § 106(b) of the Act for intrastate sales of "rollover contract" gas arbitrarily discriminate between sales by individuals and sales by state governments and Indian tribes, a violation of the due process and equal protection clauses; (Complaint in Intervention, ¶ 6); and, (3) the bifurcated system of pricing determination, under § 503 of the Act, requires a state regulatory agency to make the initial determination, with review in the federal regulatory agency and the United States Courts of Appeals. This is alleged to be an invasion of state sovereignty in violation of the Tenth Amendment (Complaint in Intervention, ¶ 7).[8] In support of his standing to raise these issues, Harvey's complaint alleges, at paragraph 3, that he is an Oklahoma citizen selling natural gas in intrastate commerce and that Marlin Oil Corporation is engaged in natural gas exploration and production, as well as in intrastate sales of gas. Defendants contend, in their motion to dismiss and for summary judgment, that Harvey must allege facts demonstrating his standing and that he has not done so, requiring dismissal.

The test applied to determine standing has been both stated and applied in a variety of ways. The most widely quoted definition of the principle of standing is found in *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663:

> "Have the [parties] alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the question of standing. It is, of course, a question of federal law."

Standing has been demonstrated by a showing of injury in fact, economic or otherwise, *Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); legally cognizable injury suffered by the party asserting it, *Baker v. Carr*, supra; direct and concrete injury, *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservist's Committee to Stop The War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); specific present objective harm or specific future harm, *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); and personal profit, *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). The conceptual principles of standing appear to be elastic and, in large part, dependent upon the type of claim alleged and remedy sought. In this instance, it is apparent that Harvey stands in a position to suffer injury in fact, under any of the various characterizations thereof, from the challenged Act. As evidenced by his affidavit in support of brief in opposition to defendants' motion to dismiss, Harvey has some nineteen wells affected by the pricing provisions of § 102(c)(1)(B), et al., and the price determination procedure required by § 503. Although Harvey has not yet gone beyond the state regulatory stage of price determina-

---

8. Harvey additionally alleges, in paragraph 4 of the complaint in intervention, that Congress' attempt to regulate entirely intrastate sales is beyond Congress' lawful power under the Commerce Clause. Defendants do not question Harvey's standing to assert this issue.

tion, the Court is satisfied that he has shown a real threat of specific future harm, by virtue of his pending applications before the state agency, which entitles him to test the constitutionality of the state-federal appellate process. The economic injury resulting from the price classification has also been established. While Harvey's complaint in intervention is perhaps too generally phrased to allow such factual conclusions, the complaint is sufficient, absent challenge, to support standing, and once standing is challenged, the Court may search the record to make its determination on the issue. *Aiken v. Obledo*, 442 F.Supp. 628 (E.D.Cal.1977). Harvey's complaint in intervention, the briefs in support of intervention, and the affidavit in support of Harvey's brief in opposition to defendants' motion to dismiss are sufficient to establish standing on Harvey's first and third claims, as described above. Harvey has made no factual allegations supporting his right to challenge the rollover contract price distinctions between individuals and states or Indian tribes. Harvey instead argues that standing is to be determined by focusing on the parties, rather than the merits of their claims, concluding that standing does not have to be shown as to each issue raised. Harvey's standing to raise issues which do not directly affect him is not a constitutional limitation of this Court's power, but a question of the prudential limits on the exercise of jurisdiction. In *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the court acknowledged the reasons for imposition of prudential limits on standing when a party who has standing as to some issues seeks also to assert the rights of others. The court added, at pp. 80–81, 98 S.Ct. at p. 2634:

"Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which

will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met."

In the present case, Harvey has established his constitutional standing to litigate three of his four claims. Moreover, it appears from the number of his wells affected by the pricing provisions of Title I that Harvey will eventually be affected by the rollover contract prices in § 106, and he has thus alleged enough to bring him within the zone of protectable interests as to this claim. The injury alleged in this claim is particularized, may be remedied by the relief requested, and is therefore properly before the Court under the standards quoted above. The Court therefore holds that plaintiff-intervenor Harvey has standing to litigate the issues raised in his complaint in intervention, and overrules defendants' motion to dismiss the complaint in intervention on this ground.

*Harvey's Motion for Summary Judgment*

Having ruled that plaintiff-intervenor Harvey has standing to raise the issues contained in his complaint in intervention, the Court next addresses those issues.[9]

*Section 102*

Harvey attacks the statutory price classifications of categories of natural gas found in § 102 of the Act. Under § 102, new natural gas is that produced from a new well at least 2½ miles from the nearest marker well or produced from at least 1,000 feet deeper than the deepest production of each marker well within 2½ miles. New gas qualifies for special incentive prices. Gas produced from new wells within these limitations may also qualify if it is shown to be from a new reservoir.

Harvey contends that the new gas pricing provision violates due process, as there is no

---

**9.** Although defendants, in their argument that Harvey lacks standing, request an opportunity to submit a brief on these issues should the merits be reached (brief in support of defendants' motion to dismiss and for summary judgment, p. 38, n. 43), defendants subsequently addressed the merits of plaintiff-intervenor's claims (brief in opposition to plaintiff's motion for summary judgment, pp. 23–30), and the Court considers plaintiff-intervenor's motion for summary judgment to be at issue.

rational basis for the 2½ mile and 1,000 feet figures found in § 102. Harvey admits that Congress may have a right to create such categories, but argues that the means employed are arbitrary, having no relation to the object of Congress. Harvey further argues that the 2½ mile and 1,000 foot depth classifications create irrebuttable presumptions, and are thus violative of due process.

■■■■ The Fifth Amendment prohibits arbitrary legislation, *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1927), and requires that the means selected by Congress have a real and a substantial relation to a permissible legislative objective. If the goals sought by federal legislation are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the legislation is not so arbitrary as to violate due process entitlements. *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). Harvey admits, and it is historically established, that encouragement of production of natural resources is a permissible legislative objective. *Mobil Oil Corp. v. FPC,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974). The remaining inquiry is thus whether the 2½ mile and 1,000 foot depth classifications are rationally related to the goal of encouragement of gas production. Harvey argues only that these classifications are not logical, in that there is no basis in petroleum geology, economics or engineering for the imposition of such limits. As a matter of law, the classifications adopted by Congress do not have to be the only alternative, or even the best alternative to be constitutional. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Harshness and oppressiveness to particular economic interests will not constitutionally invalidate legislation. *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Harvey may well have a legitimate argument that the classifications are not what they should be in a practical sense. But Congress has rather wide latitude to make such decisions and still be within its constitutional authority. At issue here is not the wisdom or practicality of Congress' chosen classifications, but whether as a matter of constitutional law they are impermissibly arbitrary, irrational or discriminatory. However, debatable, the 2½ mile and 1,000 foot depth classifications in § 102 are not unreasonable per se. The classifications further legitimate congressional objectives in providing incentives for the production of new gas as well as ease of administration of the Act.[10] Harvey has the burden of demonstrating that Congress has acted in an arbitrary and irrational way, *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), and he has done no more than complain of the categories selected by Congress, without showing that their selection is arbitrary or works in a discriminatory manner.

■■■■ The rational basis of the classifications imposed by Congress must be considered in light of Harvey's second argument on this point—that the classification creates an irrebuttable presumption that gas produced within these limits is "old" gas. The contrary is true. Congress created a presumption that gas produced *outside these limits* is "new gas". Gas produced within the 2½ mile or 1,000 foot limits may qualify for new gas pricing if it can be shown that the gas comes from a new reservoir and is, in fact, new gas. See § 102(c)(1)(C). In other words, Congress created a pricing system whereby administrative determinations of old and new gas would be facilitated. Only the production within 2½ miles of marker wells or within 1,000 feet of producing formations need be examined by the appropriate authority. The Court therefore concludes that § 102 of the Act, and its provisions regarding old

---

10. Considerations of feasibility and practicality are legitimate concerns in regulating natural gas prices. *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). This factor was considered by Congress. See, e. g., National Energy Act: Hearings on H.R. 6831 before the Subcomm. on Energy and Power of the House Comm. on Interstate and Foreign Commerce, 95th Cong., 1st Sess. (1977) at 231 (Comments of James A. Schlesinger, Ass't to Pres.)

and new gas are not, in a constitutional sense, arbitrary, nor do they create irrebuttable presumptions, so as to violate the due process clause of the Fifth Amendment. Intervening plaintiff's motion for summary judgment in this respect is denied. Defendants are entitled to judgment on this issue.[11]

### Section 106

Harvey next objects to the price ceilings on rollover contracts under § 106. A rollover contract is one entered into after the effective date of the Act that replaces an original contract whose primary term has expired. Section 106(b) allows a higher price in connection with rollover contracts for production from state or Indian lands than is available to private owners. Harvey argues that this section discriminates against private producers in favor of states and Indian tribes, in violation of the due process clause of the Fifth Amendment. Harvey contends that the state-Indian exception has no fair and substantial relation to the purposes of the Act, as the encouragement of gas production and prevention of windfall profits are not encouraged, but rather circumvented, by allowing higher prices to state and Indian tribes, entities which, Harvey concludes, are traditionally passive royalty owners with no interest in exploration reinvestment, and no risk in their investments.

The Fifth Amendment has been construed to forbid discrimination by the federal government, as is prohibited by states by the equal protection clause of the Fourteenth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). It is a fundamental standard under the Equal Protection Clause that a law (or classifications made by it) is

not unconstitutional because it is imperfect, or even because it lacks logic or scientific justification. If the classifications have some reasonable basis, the Constitution is not offended because in practice it results in some inequality. See *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) and cases cited therein. Defendants argue that the public interest is served by permitting higher prices for states and Indian tribes, supporting this argument by referring to the affidavits submitted by the plaintiff States in support of their separate motion for summary judgment, affidavits which attest to the amount and purposes of state revenue derived from gas production. The public monies derived from gas production on state-owned lands clearly benefit the states and their citizens, and this consideration is a legitimate interest of Congress. Likewise, Indian tribes are sovereigns, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), and the revenue derived from gas production, benefiting the tribes and their individual members, is a legitimate interest to be protected. Harvey has made no showing that the Congressional purpose is not a legitimate one, in promoting the revenues accruing to producing states and their citizens, or tribes and their members, nor has he shown that § 106 is not rationally related to the purpose. Harvey's motion for summary judgment on this point is therefore overruled, and defendants are entitled to judgment on this claim of intervenor's complaint.[12]

### Texas' Admission

Texas claims that federal regulation of gas produced from her public lands is contrary to the terms of her admission into the Union, and is thus violative of the Tenth Amendment.[13] Texas bases her

---

11. Although defendants have not formally moved for summary judgment against Harvey, having chosen instead to move to dismiss on the grounds that Harvey lacks standing, all parties have asserted that there are no issues of fact present in this case and that the issues are solely ones of law for the Court. Under the circumstances of this case, granting judgment in favor of a non-moving party is appropriate.

12. See footnote 11, supra.

13. Although Oklahoma asserted a similar allegation in the amended complaint, her argument in this respect has apparently been abandoned, as there is no further mention of Oklahoma's admission in the briefs or elsewhere. The Court therefore treats this issue as it relates to Texas only.

claim on the unique pre-admission history of the Republic of Texas. The joint resolution of Congress which offered the terms of admission reads as follows:

> "*Resolved, by the Senate and House of Representatives of the United States of America in Congress assembled*, That Congress doth consent that the territory properly included within, and rightly belonging to the Republic of Texas, may be erected into a new State, to be called the State of Texas, with a republic form of government, to be adopted by the people of said Republic, by deputies in convention assembled, with the consent of the existing government, in order that the same may be admitted as one of the States of this Union.
>
> 1. * * *
>
> 2. *And be it further resolved*, That the foregoing consent of Congress is given upon the following conditions, and with the following guarantees; to wit: . .
>
> *Second.* Said State, when admitted into the Union, after ceding to the United States all public edifices, fortifications, barracks, ports and harbors, navy and navy-yards, docks, magazines, arms, armaments, and all other property and means pertaining to the public defence belonging to the said Republic of Texas, shall retain all the public funds, debts, taxes, and dues of every kind, which may belong to or be due and owing said Republic; *and shall also retain all the vacant and unappropriated lands lying within its limits*, to be applied to the payment of the debts and liabilities of said Republic of Texas, *and the residue of said lands, after discharging said debts and liabilities, to be disposed of as said State may direct*; but in no event are said debts and liabilities to become a charge upon the government of the United States. . . .
>
> 3. *And be it further resolved*, That if the President of the United States shall, in his judgment and discretion, deem it most advisable, instead of proceeding to submit the foregoing resolution to the Republic of Texas, as an overture on the part of the United States for admission, to negotiate with that Republic; then, *Be it resolved*, That a State, to be formed out *of the present Republic of Texas, . . . shall be admitted into the union, by virtue of this act, on an equal footing with the existing States, . .*"
> [Emphasis added].

The first alternative, i. e., §§ 1 and 2 of the joint resolution, was implemented. Texas argues that by virtue of its retention of its public lands, Congress may not regulate or abridge Texas' power to contract with respect to natural gas produced from those public lands. This issue has been discussed in a different context in *United States v. Texas*, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950). There, Texas denied the claim of the United States to ownership of the submerged lands off her coast, arguing that Texas had owned the submerged lands prior to entry and did not surrender them upon annexation to the United States. The Supreme Court held that Texas had been admitted on an equal footing with every other state and that equal footing negatived "any implied, special limitation of any of the paramount powers of the United States in favor of a State." *Id.*, at 717, 70 S.Ct. at 923. Texas responds to the apparent authority of *United States v. Texas*, supra, by asserting that "[t]he court's use of the 'equal footing' language was unfortunate, and worse, was erroneous."[14] Texas bases its argument on the dissent, which noted that equal footing had previously encompassed only political rights, or those rights considered necessary attributes of state sovereignty. Texas also notes that the parties in *United States v. Texas*, supra, had not briefed the equal footing issue, concluding that they "must have felt that the 'equal footing' language of section 3 of the joint resolution was indeed part of an *alternative* mode of annexation and not one of the terms of the annexation agreement."[15] This statement embodies an argument im-

---

14. Brief in opposition to defendants' motion to dismiss and for summary judgment, p. 25.

15. *Id.*, p. 26.

plicit throughout Texas' briefs on this issue—that because § 3 of the joint resolution was not implemented, Texas was therefore not admitted "on an equal footing with the existing states," but instead retained her lands, not subject to the supreme constitutional authority of the United States. Texas' argument must fail. The joint resolution which actually admitted Texas into the Union (passed subsequent to Texas' approval of the first joint resolution, quoted above, which offered the terms of admission), expressly declared that Texas is "admitted into the Union on an equal footing with the original States in all respects whatever." 9 Stat. 108 (Dec. 29, 1845); see also *United States v. Texas*, supra, at 713, 70 S.Ct. at 921. That Texas must exist on an equal footing with other states cannot be disputed; nor can the clear pronouncement of the Supreme Court as to the effect of the equal footing doctrine be ignored:

> "The 'equal footing' clause prevents extension of the sovereignty of a State into a domain of political and sovereign power of the United States from which the other States have been excluded, just as it prevents a contraction of sovereignty [citation omitted] which would produce inequality among the States." *United States v. Texas*, supra, at 719–20, 70 S.Ct. at 924.

In any event, the NGPA does not conflict with Texas' retention over her public lands, as provided in the joint resolution offering admission. No ownership or control over ownership is being exerted over land by virtue of the Act. Rather, the paramount power of Congress to regulate interstate commerce simply overrides Texas' internal policy decisions concerning natural resources produced from that land. In sum, the Court holds that Texas' admission to the

United States was on an equal footing with all other states, and Texas is thus subject to the paramount power of Congress to regulate interstate commerce. Moreover, the particular regulations of the NGPA do not interfere with Texas' ownership of her public lands in a constitutionally impermissible manner. Plaintiff's motion for summary judgment on this issue is therefore overruled, and the motion for summary judgment of defendants on this issue is granted.

### Regulation of Intrastate Gas

Congressional power to impose price controls upon and otherwise regulate wholly intrastate gas is the primary issue in this case. All plaintiffs and intervenors have alleged that the NGPA exceeds the power of Congress to regulate interstate commerce,[16] and have further alleged that the method of regulation adopted by Congress interferes with the states' traditional functions and is therefore impermissible by virtue of the Tenth Amendment.

It is now beyond argument that Congress may regulate activities which are wholly intrastate when the intrastate activity either has a substantial economic effect on interstate commerce or where federal regulation of the intrastate activity is necessary to effectuate interstate regulation. See, e. g., *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975); *Daniel v. Paul*, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969); *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Such power includes regulation of prices of intrastate products and activities. *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *United States v. Wrightwood Dairy*

---

**16.** In the amicus brief of David Engdahl, an energetic plea is made for the correct analysis of this case as arising under the Necessary and Proper Clause, rather than the Commerce Clause. Article I, § 8 gives Congress the power to "regulate commerce . . . among the several states," and to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." While the power to regulate intrastate commerce is de-

rived from the Necessary and Proper Clause, as it relates to the Commerce Clause, once this analysis has been made, further pursuit of the semantic distinction serves no purpose. In practical terms, the end result is the same and in keeping with most of the cases relied on in this opinion, the Court refers throughout to the Commerce Clause, rather than to the Commerce Clause as aided by the Necessary and Proper Clause.

*Co.*, 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942); *Houston, East & West Texas Railway v. United States*, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 341 (1914). This Court's role in assessing the present challenge to Congress' regulation of intrastate commerce is limited to a determination of two factors— whether Congress had a rational basis for determining that the unregulated intrastate gas market affected interstate commerce, and, if so, whether the means selected by Congress were reasonably adapted to eliminating the burden. *Arizona Public Service Co. v. Snead*, 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979); *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1972); *Heart of Atlanta Motel, Inc. v. United States*, supra; *Katzenbach v. McClung*, supra.[17] In determining whether a rational basis exists for the finding of burden on interstate commerce, the Court may not substitute its judgment for that of Congress, but must look at the legislative history and the acts and testimony before Congress.[18] If "a rational basis for finding

a chosen regulatory scheme necessary to the protection of commerce [is found], our investigation is at an end." *Katzenbach v. McClung*, supra, 379 U.S. at 303–04, 85 S.Ct. at 383.

■ The legislative history of this Act is lengthy. The Court has studied the Senate, House, and Joint Conference Committee Reports,[19] as well as the transcript of hearings before the House Subcommittee.[20] The history reveals that the evidence relied on by the Congress was that since 1967, production of natural gas has consistently exceeded new additions to proved reserves;[21] known gas reserves outside Alaska have declined dramatically,[22] and the interstate market has suffered as a result of this decline;[23] since 1969 more than 80% of all new gas has been committed to the intrastate market, most of the interstate commitments coming from the federal domain;[24] between 1967 and 1975, reserves dedicated to interstate use have dropped 46%, as opposed to a 3% decline in the

---

17. Plaintiffs conclude that a third analysis is necessary—whether the regulation imposed is the least restrictive alternative. Those cases cited by plaintiffs do not impose this requirement, but rather discuss the burdensomeness of regulation as a factor to be considered in deciding whether state sovereignty has been impermissibly violated. The limits of judicial analysis are clearly defined in *Heart of Atlanta Motel, Inc. v. U. S.*, 379 U.S. 241, 261–62, 85 S.Ct. 348, 360, 13 L.Ed.2d 258:

"It may be argued that Congress could have pursued other methods to eliminate the obstructions it found in interstate commerce caused by racial discrimination. But this is a matter of policy that rests entirely with the Congress not with the courts. How obstructions in commerce may be removed—what means are to be employed—is within the sound and exclusive discretion of the Congress. It is subject only to one caveat—that the means chosen by it must be reasonably adapted to the end permitted by the Constitution. We cannot say that its choice here was not so adapted. The Constitution requires no more."

18. Congress need not make formal, statutory findings if the evidence presented fully indicates the nature and effect of the burdens on commerce which Congress intended to alleviate. See *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *U. S. v.*

*Dawson*, 467 F.2d 668 (8th Cir. 1972), cert. denied 410 U.S. 956, 93 S.Ct. 1427, 35 L.Ed.2d 689. Neither must particularized findings be made for each point of a program. See *U. S. v. Sacco*, 491 F.2d 995 (9th Cir. 1974).

19. S.Rep.No.95–436, 95th Cong., 2d Sess. reprinted in (1978) U.S.Code Cong. & Admin. News, p. 7855, et seq. (hereafter "S.Rep.95–436 at 1"); H.R.Rep.No.95–496 Part IV, 95th Cong., 2d Sess. reprinted in (1978) U.S.Code Cong. & Admin.News, p. 8454, et seq. (hereafter "H.R. Rep.95–496 at 1"). Joint Explanatory Statement of the Committee on Conference, H.R. Rep.No.95–1752, 95th Cong., 2d Sess. (hereafter Conference Report), U.S.Code Cong. & Admin.News 1978, p. 8800.

20. National Energy Act: Hearings on H.R.6831 before the Subcomm. on Energy and Power of the House Comm. on Interstate and Foreign Commerce, 95th Cong., 1st Sess. (1977) (hereafter referred to as "H.R. Hearings").

21. H.R.Rep.95–496 at 91.

22. *Id.*

23. S.Rep.95–436 at 8, 25; H.R.Rep.95–496 at 90–95.

24. S.Rep.95–436 at 19.

intrastate markets for this period;[25] the volume of gas sold interstate has likewise decreased;[26] the higher prices received in intrastate sales were blamed for the reduction of gas dedicated to interstate markets, and the corresponding shortages of natural gas in non-producing states, particularly the severe shortage in the winter of 1976–77.[27] From a review of the facts and testimony before Congress, the Court must conclude that from the evidence before it a rational basis existed for the Congress' finding that unregulated intrastate gas "imposed a burden" on interstate commerce under the tests cited above.

Those provisions of the NGPA attacked by plaintiffs which do not affect the price of intrastate gas likewise have a rational basis and do not exceed Congress' Commerce Clause power. The emergency purchase and allocation authority of the President, as well as provisions affecting allocation and distribution of intrastate gas into interstate pipelines are necessary to the purpose of the NGPA in reducing impediments to the flow of gas between interstate and intrastate markets, and insuring availability of natural gas.[28] These provisions, while affecting intrastate commerce, are necessary to effectuate Congress' chosen scheme of regulation of interstate commerce.

The next consideration is whether the regulatory scheme adopted by Congress is reasonably adapted to eliminating the burden on interstate commerce. In this respect, to be constitutionally permissible, Congress is not required to employ the best or least restrictive methods, but only reasonable ones. *Heart of Atlanta Motel, Inc. v. United States,* supra. Congress' overall analysis of the problem was very simply a choice between total deregulation or inclusion of the intrastate markets in a federal regulatory scheme.[29] The Court is unable to find much, if any, disagreement in the testimony before Congress that elimination of the previously existing problems of the dual market system was necessary to the formulation of an adequate energy program. The Court concludes that Congress' choice of total regulation, i. e., inclusion of the intrastate market in the federal regulatory scheme, was "rationally based", as the Constitution requires, on the evidence before it, particularly the contention that severe hardship would accrue to individual consumers as a result of total deregulation and corresponding price increases. While this evidence and conclusion is the subject of much debate, the decision cannot be held to be irrational as a matter of law. Evidence considered by the Congress predicted that removal of all price restraints on new gas would result by 1985 in an annual shift of as much as $20 billion from consumers to producers over revenues obtained through price ceilings, with little additional supply.[30] Another estimate of cost to consumers was $53–$79 billion in the next eight years.[31] Evidence of this dramatic impact on consumers,[32] coupled with what Congress was told of the possibility of huge windfall profits to producers, as well as other problems,

25. H.R. Hearings 299–301 (Graphs published by FPC Bureau of Natural Gas, attached to prepared statement of C. M. Allen, Division Natural Gas Geologist with Phillips Petroleum Co.).

26. H.R.Rep.95–496 at 95; S.Rep.95–436 at 8.

27. See, e. g., S.Rep.95–436 at 19, 21, 25; H.R. Rep.95–496 at 92–95.

28. H.R. Hearings 66–67 (Statement of James R. Schlesinger, Assistant to the President).

29. H.R.Rep. at 110–11; S.Rep. at 34; H.R. Hearings at 388 (comments of David H. Foster, Executive vice pres., Natural Gas Supply Comm.), 475 (comments of Congressmen Sharp

and Walgren), 523–24 (statement of Mack Wallace, Chairman of the Railroad Commission of Texas).

30. H.R. Hearings at 68, 73 (Statement of James R. Schlesinger, Ass't to Pres., and accompanying chart).

31. H.R.Rep.95–496 at 118.

32. See, e. g., testimony relating to the effect of deregulation on consumers, H.R. Hearings at 561–63 (statement of Edwin L. Faust, Mayor, Grey Forest, Texas), 564–73 (statement of Lane Denton, Legislative Dir., Texas Farmer's Union).

apparently convinced Congress to adopt the NGPA, rather than some form of deregulation.[33] However doubtful the Court might be that the method chosen by Congress to encourage production and exploration and insure availability of natural gas is a wise one,[34] it is not the function of the judiciary to re-write the law by substituting its judgment in such policy matters for that of Congress. The question before the Court is one of constitutionality, not policy. That the regulation imposed in the NGPA is at least reasonable in the context of constitutional standards is an inescapable conclusion, when the legislative history and the alternatives available are considered.

 While enactment of the NGPA is within constitutional congressional commerce power, the inquiry is not at an end. In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court held that the power to legislate pursuant to the Commerce Clause is limited by the constitutional doctrine of intergovernmental immunity, i. e., Congress may not interfere with state sovereignty, even under the guise of otherwise permissible Commerce Clause power. The test enunciated in *National League of Cities* is whether Congress impinges upon the sovereign power of the "state qua state" in performing essential governmental functions. The Court listed examples of traditional state operations (a typical but not exhaustive list) as fire and police protection, sanitation, public health, and parks and recreation. *Id.* at 851, 96 S.Ct. at 2474. Plaintiff States assert that federal regulation of intrastate gas will severely reduce state revenues which are presently devoted in the various states to education, roads, services programs, and/or other essential state services, thereby destroying the eco-

nomic integrity of the states. The states further assert that the Act would impose federal regulation of natural resources, and interfere with the administration, use, control and conservation of resources from state-owned land, both areas previously reserved to the states. While plaintiffs make a convincing argument that the federal regulation is unwise, the Court cannot agree that the regulation imposed by the NGPA is unconstitutional under *National League of Cities*, for two different but fundamental reasons. First, the states have made only several generalized and hypothetical conclusions with respect to losses of revenues under the Act. A particularized assessment of actual impact would not be crucial to the resolution of this issue under *National League of Cities*, if some factual showing establishes that the impact is so great as to displace the state's freedom to·structure integral operations in areas of traditional governmental functions. Here the absence of facts demonstrating the required magnitude of impact is important because the states' main objection to the Act appears to be a reduction of revenues. It is also important because the Act, while imposing a ceiling on intrastate gas prices, also raises the interstate price, so that while revenue from intrastate gas may decrease, revenue from interstate gas increases. The net effect of the entire Act is not evaluated in plaintiffs' affidavits, and there is no way to determine, from the information before the Court, just how drastic the loss of revenue or services is or may be.[35] The cost of complying with federal regulation and the corresponding reduction of the quality of state-provided services were primary considerations in *National League of Cities*. The states have not made a sufficient showing in these respects.

---

**33.** See, e. g., H.R.Rep.95–496 at 95, 97–101, 110–118; S.Rep.95–436 at 34.

**34.** One commentator concludes that "[t]he NGPA reveals congressional concern not for equity and efficiency in the use of natural resources, but rather for the most obvious and numerous group of voters." MacAvoy, "The Natural Gas Policy Act of 1978", 19 *Nat.Resources J.* 811, 828 (1979).

**35.** In the only affidavit to refer to specific dollar amounts, before and after passage of the Act, it appears that the State of Wyoming had billed more severance taxes in the first seven months of 1979, under the NGPA, than had been collected the entire year in 1978. Aff. of Rudolph Anselmi, Chairman, Wyoming Department of Revenue and Taxation.

Secondly, and most importantly, the power to regulate gas produced and sold intrastate is not the type of "traditional state function" from which Congress is prohibited from interfering under *National League of Cities*. It is not the states' roles as providers of roads, education, and similar traditional state functions which is infringed by the Act, but, if anything, their choice of methods by which to fund such functions. The distinction is essential. Under the NGA, the Supreme Court has rejected an argument that impairment of state revenues must be considered. *In Re Permian Basin Area Rate Cases*, 390 U.S. 747, 822, n. 114, 88 S.Ct. 1344, 1389 n. 114, 20 L.Ed.2d 312 (1968); *FPC v. Hope Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). While the impact on individual state treasuries is a critically important factor for the Congress to consider, the constitutionality of the Act is not necessarily dependent on it. If the financial impact on the functioning of the governmental bodies involved were so severe as to impair the states' ability to function effectively in a federal system, as in *National League of Cities*, then it could be said that the impact and intrusion threatens the states' separate and independent existence. *Coyle v. Oklahoma*, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911). Such is not the case here. Federal regulation which has an indirect effect on state treasuries is not the same impermissible intrusion on state sovereignty found in *National League of Cities*. See *Public Service Co. v. FERC*, 587 F.2d 716 (5th Cir. 1979), cert. denied 444 U.S. 879, 100 S.Ct. 166, 62 L.Ed.2d 108.

Plaintiffs' argument that federal regulation of gas produced on state land is prohibited by *National League of Cities* was rejected in *Public Service Co. v. FERC*, supra. There the Fifth Circuit concluded that commercial activity operated by a state is subject to federal regulation and is not a "traditional governmental function" of the sort described in *National League of Cities*. The state has traditionally been subject to federal regulation under the Commerce Clause when it engages in economic activities of a proprietary nature, similar to those of private parties. See, e. g., *Parden v. Terminal Railway*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); *California v. Taylor*, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957); *Case v. Bowles*, 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1942). Plaintiffs' argument in this respect must fail.

Plaintiffs' final argument under *National League of Cities*, that the conservation of natural resources is a traditional state function with which Congress may not interfere, is rejected in a long line of precedent recognizing the states' traditional role in conservation of natural resources, but holding that the states may not encroach, through conservation measures, upon preemptive federal regulation under the NGA. See, e. g., *Northern Gas Co. v. Kansas Commission*, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963); *FPC v. Corporation Commission of State of Oklahoma*, 362 F.Supp. 522 (W.D.Okl.1973), aff'd without opinion, 415 U.S. 961, 94 S.Ct. 1548, 39 L.Ed.2d 863 (1974). Congress may preempt state conservation regulation which interferes with or burdens interstate commerce. *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *Douglas v. SeaCoast Products, Inc.*, 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977). Moreover, plaintiffs have not demonstrated how the NGPA conflicts with, or detracts from their current conservation policies or procedures to the extent that traditional governmental functions are displaced.[36]

---

**36.** *Virginia Surface Mining and Reclamation Assoc., Inc. v. Andrus*, 483 F.Supp. 425 (W.D. Va.1980) enjoined certain portions of the Surface Mining Control Reclamation Act of 1977 as violative of the 10th Amendment under *Nat. League of Cities*. The Court held that state regulation of land use is a traditional governmental function, and the enjoined portions of the Act, as they displaced the state's ability to make "essential decisions" and deprived the state of any discretion or control over economic development in the affected areas, were violative of the 10th Amendment. The NGPA does not so totally displace state control or discretion, and cannot be struck down on this theory.

█ Finally, plaintiffs argue that the NGPA is in conflict with the Submerged Lands Act, 43 U.S.C. §§ 1301–1315, which specifically recognizes state ownership of lands beneath their navigable waters, and the natural resources therein. While § 1314(a) of the SLA excludes the United States' rights of "ownership, . . . management, administration, leasing, use, and development of . . . natural resources," the same section also specifically retains the federal power of regulation and control of such lands for the purpose of commerce. Thus federal power to regulate such lands was not curtailed by the SLA. *United States v. Rands*, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); *Zabel v. Tabb*, 430 F.2d 199 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808. Correspondingly, regulation of natural resources contained in such lands was not curtailed, either. The conflict imagined by plaintiffs in this instance does not exist.

The Court therefore finds that the NGPA and its federal regulation of intrastate gas is a legitimate exercise of Congress' power under the Commerce Clause and is not barred by the Tenth Amendment, the doctrine of intergovernmental immunity, or any other constitutional limitation.

### Title V

Having found that the regulation of wholly intrastate gas provided in the Act does not exceed Congress' constitutional power and does not, in general, interfere with the traditional functions of "states qua states", the Court next turns to a more particular analysis of Title V of the Act, and specifically § 503. As noted at pp. 646 and 647, supra, Title V sets out procedures for implementation and judicial review. Two distinct challenges have been made to these procedures. The states argue that the administrative burden imposed upon them under the Act violates state sovereignty, the constitutional doctrine of intergovernmental immunity, the constitutional guarantee of a republican form of government, due process, equal protection, and the Tenth Amendment. Plaintiff intervenor Harvey argues that the amalgamation of state-federal court review violates state sovereignty and the Tenth Amendment.

### Federal Review of State Agency Determination

Section 503 requires sellers of natural gas to obtain a determination of the maximum lawful price under Title I of the Act before charging the maximum price. The state agency having regulatory jurisdiction over the production of natural gas is authorized to make this determination. Procedure in the state agency is that generally applicable in the agency, but FERC may "prescribe the form and content" of filings with the agency. Section 503(c)(3). State agency decisions are not reviewable except as provided in the Act, § 503(c)(4), which requires review in FERC, with further review in a United States Circuit Court of Appeals. Section 503(b). The state agency must give notice of its determinations to FERC, including the substantiation, and in the manner which FERC may, by rule, require. Section 503(a)(2). FERC may reverse any state agency determination which is not supported by substantial evidence in the record, § 503(b)(1)(A), and may remand if not consistent with information in FERC's public records. Section 503(b)(2).

█ There can be no serious question that Congress may confine jurisdiction over suits involving federal law to the federal courts, and thus the review procedures of the NGPA, per se, are not attacked, only that they are engrafted upon a state agency determination. In *Holmgren v. United States*, 217 U.S. 509, 517, 30 S.Ct. 588, 589, 54 L.Ed. 861 (1910), the Supreme Court stated:

"It is undoubtedly true that the right to create courts for the states does not exist in Congress. The Constitution provides (art. 3, § 1) that the judicial power of the United States shall be vested in one Supreme Court and in such inferior courts as the Congress may, from time to time, ordain and establish. But it does not follow that Congress may not constitu-

tionally authorize the magistrates or courts of a state to enforce a statute . . . .

The question is not here presented whether the states can be required to enforce such . . . laws against their consent, . . . . Unless prohibited by state legislation, state courts and magistrates may exercise the powers conferred by Congress under such laws. . . . ."

It is no longer questioned that Congress may delegate certain adjudicatory and legislative duties to an administrative agency. There is no indication in any authority provided to or found by the Court that this delegation may not properly be made to a state rather than federal administrative agency. The NGPA does not impose the federal appellate process on a state agency determination, as argued by Harvey. Rather, it makes the state agency determination the first step in the federal administrative chain, delegating to the state agency, providing it consents, the duty of making the initial determination under the Act, with review thereafter in the appropriate federal forum.

 Congress has not exceeded the limitation of the Tenth Amendment and the doctrine of intergovernmental immunity in delegating the initial price determination to state agencies. The test, as discussed above, is whether the challenged legislation directly displaces "the States' freedom to structure integral operations in areas of traditional governmental functions." *National League of Cities v. Usery*, supra, 426 U.S. at 852, 96 S.Ct. at 2474. While not mentioned as an example in *National League of Cities*, a state's administrative and judicial processes must surely constitute a "traditional governmental function." However, the Act does not intrude on or displace the states' freedom to structure

these processes within the meaning of these limitations. FERC must affirm if the state agency determination is supported by substantial evidence. De novo review is not prescribed at any appellate level and thus the state agency's findings are given conclusive weight if supported by substantial evidence. Additionally, the conference committee report makes clear the Act's intent that traditional state review over procedural matters is not precluded under the Act.[37] Thus, a party is entitled to all procedural requirements of the particular state agency and also to state court review of those procedures. In this way no state-prescribed rights are forfeited by the Act. A party may proceed by appeal to both the appropriate state court on procedural matters and to FERC on the question of substantial evidence. Finally, while Harvey complains that certain subsections of § 503 allow FERC to prescribe rules of procedure in the initial state agency determination, he makes *no showing* that any such rules have been promulgated or that they would circumvent the agency's own rules.[38] This argument is either premature or unsupported in the record and does not serve to support Harvey's Tenth Amendment argument.

 The Court must therefore conclude that the provisions in § 503 which delegate the initial determination of maximum price to the appropriate state agency, with review in the federal courts, are permissible under Article III of the Constitution and the Commerce Clause, and do not violate, in an unconstitutional manner, the sovereignty of the states.

*States' Challenge to Title V*

The plaintiff States do not separate their attack on Title V from their remaining

---

37. Joint Explanatory Statement of the Committee on Conference, H.R.Rep.No.95–1752, 95th Cong., 2d Sess. 119.

38. While the Court has found that the plaintiffs' complaint, in citing sections of the Act which delegate power to enact rules to FERC, presents a case or controversy, ripe for review, in that context the issue presented is specific

and concrete. Here, with Harvey's specific attack of subsections of 503 which allow, but do not require, FERC regulation, and with no showing of either the existence or scope of pertinent rules which *might* be in conflict *if* FERC promulgates rules, the Court would be ruling on hypothetical facts.

Tenth Amendment arguments; the Court has chosen to do so because the considerations involved in an analysis of Title V of the Act are different from those concerning congressional power to regulate wholly intrastate gas. The states argue that they are coerced into administering the Act, spending state funds for the operation of a federal program on behalf of a federal agency. This is contended to be an impermissible intrusion into traditional state functions. *National League of Cities v. Usery*, supra. Defendants respond simply that the states are not coerced to act and that therefore the administrative scheme is constitutional.

The distinction between "coercion" and "permission" is supported in a long line of precedent which holds that the federal government may delegate implementation of federal programs to states willing to comply. These cases arise for the most part from legislation conditioning the grant of federal funds upon the state's compliance with some federal program. Rejection of state sovereignty arguments is on the theory that the state has "the 'simple expedient' of not yielding to what she urges is federal coercion." *Oklahoma v. Civil Service Commission*, 330 U.S. 127, 143–44, 67 S.Ct. 544, 554, 91 L.Ed. 794 (1946). See also *Steward Machine Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); *Florida v. Mathews*, 526 F.2d 319 (5th Cir. 1976); *Doe v. Rose*, 499 F.2d 1112 (10th Cir. 1974); *Arizona State Dept. of Public Welfare v. HEW*, 449 F.2d 456 (9th Cir. 1971), cert. denied 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789; *Stiner v. Califano*, 438 F.Supp. 796 (W.D.Okl.1977); *Goodin v. Oklahoma*, 436 F.Supp. 583 (W.D.Okl.1977). These cases are, of course, distinguishable, as the question here is not whether Congress can condition payment of federal funds on the state's compliance with the Act, as there are no funds involved. This, in fact, is the state's main complaint—that they are required to expend their own funds to administer the federal regulatory scheme. The states' complaint with respect to the NGPA is more analogous to cases like *Friends of the Earth v. Carey*, 552 F.2d 25 (2nd Cir. 1977), where the court stated that when the implementation by the states of a federal act cannot, under the act, be enforced by the imposition of sanctions, the Tenth Amendment is not implicated. The quid pro quo for state compliance was said to be that the federal government would not substitute or administer its own plan for that of the state. See also *Natural Resources Defense Council, Inc. v. Costle*, 564 F.2d 573 (D.C. Cir. 1977); *Sparks v. Wyeth Laboratories, Inc.*, 431 F.Supp. 411 (W.D.Okl.1977). The standard against which these cases were decided is that discussed in *District of Columbia v. Train*, 521 F.2d 971 (D.C. Cir. 1975) vacated, 431 U.S. 99, 97 S.Ct. 16, 35, 52 L.Ed.2d 166 (1977) reinstated and modified sub nom. *District of Columbia v. Costle*, 567 F.2d 1091 (D.C. Cir. 1977); *Maryland v. EPA*, 530 F.2d 215 (4th Cir. 1975) vacated, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977); *Brown v. EPA*, 521 F.2d 827 (9th Cir. 1975) vacated, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977).[39] In these cases regulations of the Environmental Protection Agency promulgated under the Clean Air Act were invalidated because the states were subject to sanctions if they did not devise a federally-accepted program of implementation of the Act. The NGPA in § 503 "authorizes" appropriate state agencies to make certain determinations. There is no requirement of state cooperation and no sanctions are levied in the event a state agency refuses to act. While the Act requires the agreement of FERC before a waiver of state authority is effective, § 503(c)(2), there is no mandatory requirement of state agency action even absent FERC's agreement, and no sanction provid-

---

**39.** Although all three of these opinions were vacated by the Supreme Court in *EPA v. Brown*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), the action of the Court was taken in light of the Administrator's abandonment of certain issues, his admission that certain of the rules as drafted were invalid, and the resultant narrowing of issues on appeal. The cases were remanded for consideration of the question of mootness, and the Court's action does not overturn or dilute the reasoning or result reached in the Courts of Appeals.

ed for a state whose agency does not act. Thus there is no "coercion" in the constitutional sense, and the Act in this respect must be upheld. As there is no evidence of any agency or state having attempted to obtain FERC's agreement to a waiver, the Court cannot speculate as to the difficulties or conditions which might be encountered by a state attempting to waive its authority. Whether FERC's refusal to enter into an agreement, or its placing conditions upon it, might invalidate this portion of the Act as an impermissible invasion of state sovereignty is, at this time, not ripe for review.

■■■ The states have raised an additional argument, that the equal footing doctrine prevents the administrative burden imposed upon the states under the NGPA. They argue that it is fundamentally unfair to require the natural gas producing states to unilaterally shoulder the economic burden, for the benefit of nonproducing states, of implementing a federal regulatory scheme which, in addition to the costs of administration, otherwise severely reduces state revenues. This burden, they argue, is not imposed on states producing other or no energy resources, and the effect is thus contrary to the equal footing doctrine. The Court, sitting as it does in a state long dependent on the natural gas industry, is understandably sympathetic to plaintiffs' arguments. It is inequitable to impose both revenue-reducing regulations and the cost of their administration upon certain states only. The government has offered no example of an analogous regulatory scheme, despite repeated inquiries from the Court at oral argument to do so. But, while citizens of gas producing states may justifiably complain that Congress' scheme is practically and economically unwise and unfair, the Court is compelled to conclude that the policy adopted by Congress is within its legislative powers and is not constitutionally impermissible.[40] As a matter of constitu-tional law, the equal footing doctrine does not require economic equality among the states. *United States v. Texas,* 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950). As the Act does not command any state action, and the states are free to refuse to act and thus to avoid payment for administration, there can be no violation of either the Tenth Amendment or the equal footing doctrine. The Court therefore holds § 503 to be constitutionally permissible.

### Fifth Amendment Claims

■■■ The plaintiff States have alleged that certain portions of the NGPA violate the Fifth Amendment, i. e., due process, equal protection, and a taking without just compensation. The states are not "persons" within the language of the due process clause, and their claims on this ground are without merit. *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Neither does a state have standing to raise due process claims on behalf of its citizens against the federal government. *South Carolina v. Katzenbach,* supra; *Florida v. Mellon,* 273 U.S. 12, 47 S.Ct. 265, 71 L.Ed. 511 (1927). As equal protection is implicated in the Fifth Amendment, if at all, through the due process clause,[41] the states can have no standing on those claims, as well. Insofar as plaintiff States are entitled to raise due process claims on their own behalf, as producers of natural gas on state-owned lands, their claims must fail for the same reasons discussed with respect to plaintiff-intervenor Harvey's claims, pp. 649–651, supra. Finally, federal regulation of prices does not constitute a taking without just compensation under the Fifth Amendment. *The Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *FPC v. Hope Natural*

40. The states' theory under the equal footing doctrine appears to be an ingenious attempt to assert what would otherwise be a due process claim, which, for the reasons stated below, is unavailable to the states. Disguising such a claim under the rhetoric of the equal footing doctrine does not create standing on the part of the states to assert it.

41. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

*Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). The Court therefore concludes that the Fifth Amendment claims of the plaintiff states are without merit.

### Guarantee Clause

 The NGPA does not violate the constitutional guarantee of a republican form of government, as alleged by plaintiff States. No argument has been made in support of this allegation, and it is obvious that federal regulation of intrastate gas does not modify any state government, or in any way deny a republican form of government to any state.

### Eleventh Amendment

Plaintiff States generally aver that various portions of the Act violate their Eleventh Amendment rights. This general allegation is elaborated only by plaintiffs' argument that Title V of the Act forces the states "to become party to federal court proceedings in order to defend their own determinations." [42] Section 503(b)(4)(A) and (B), referred to by plaintiffs, do not require states to become parties to any proceedings or in any way violate the Eleventh Amendment.

### Conclusion

In accordance with the foregoing, the Court finds the Natural Gas Policy Act to be constitutional. This decision does not find the Act to be wise or fair or best suited to meet the present and future economic and energy needs of the nation. But it is fundamental that establishment of policy in these respects is the business of the elected legislative branch—the Congress. As long as the laws enacted are within its constitutional authority the Courts are not empowered to re-write, or veto them, or to second-guess or otherwise undo its chosen policy despite possible errors of judgment. Accordingly, the motions for summary judgment on behalf of plaintiffs and intervening plaintiffs are denied; the motion to

dismiss of defendant and intervening defendant is denied; the motion for summary judgment of defendant and intervening defendant is granted. Judgment shall enter accordingly.

It is so ordered.

---

42. Plaintiffs' brief in support of plaintiff's motion for summary judgment, p. 10. See also *id.* at 34.